DA 10-0256

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2011 MT 62

IN THE MATTER OF THE CONSERVATORSHIP OF

J.R.,

A Protected Person.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDG 2006-18
Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Janet Hetherwick Pumphrey, Attorney at Law, Lenox, Massachusetts

Joey Jayne, Joey Jayne Law Office, Arlee, Montana

For Appellee:

Jacqueline T. Lenmark, Thomas Q. Johnson, Keller, Reynolds, Drake,
Johnson & Gillespie, P.C., Helena, Montana

Submitted on Briefs:   January 20, 2011

Decided:   April 5, 2011

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     J.R. appeals an order of the District Court for the First Judicial District, Lewis and Clark County, dismissing his claims against his conservator for negligence and for breach of fiduciary duty.  We affirm.

¶2     J.R. raises four issues which we have restated as follows:

¶3     1.   Whether the District Court erred in dismissing J.R.'s claims of breach of fiduciary duty and negligence because J.R. did not offer expert testimony.

¶4     2.   Whether the District Court's ultimate finding that the conservator appropriately managed J.R.'s assets and estate was erroneous.

¶5     3.   Whether the District Court erred in discharging the conservator without liability.

¶6     4.   Whether the District Court abused its discretion in ordering payment of the conservator's attorney's fees from the conservatorship's assets.

**Factual and Procedural Background**

¶7     In May 2006, at the time the conservatorship proceedings in this case began, J.R. was 78 years old.  He has five children and three step-children.  His wife passed away in 2003.  J.R.'s daughter Marsha initiated this action when she petitioned the District Court for appointment of a conservator for J.R.  She stated in her petition that a conservator was necessary for J.R.'s protection because he suffers from severe short-term memory loss and has been diagnosed as suffering from early Alzheimer's disease.  She further stated that J.R. is no longer capable of understanding his bank or financial statements; that

significant funds owned by him have disappeared; and that he is extremely vulnerable to the demands and influences of others.

¶8    The District Court scheduled a hearing on Marsha's petition for September 26, 2006. However, shortly before the hearing date, J.R.'s daughter Robin, who opposed the conservatorship action, removed J.R. from Helena and took him to live with her in Massachusetts. Neither J.R. nor Robin notified J.R.'s counsel of J.R.'s move.

¶9    The parties eventually stipulated to a limited conservatorship, and the District Court appointed the first conservator, Cindy Nickol of Capital City Case Management, on November 24, 2006. In March 2007, Nickol filed an Inventory of Conservator showing that the value of J.R.'s assets at that time was more than $290,000. These assets included the condominium in Helena where J.R. had lived for many years, an investment account with D.A. Davidson & Co., and a checking account at Mountain West Bank. Not included in this valuation were any of J.R.'s personal belongings such as the antiques and art work that he and his wife had collected over the years.

¶10    In June 2007, Nickol requested that the court terminate her appointment as conservator because of persistent family interference with the performance of her duties and efforts by various family members to undermine the conservatorship. A hearing on a petition to amend the conservatorship was held on August 17, 2007. Thereafter, the court issued an order allowing Nickol to withdraw as conservator. In her place, the court appointed Joseph Shevlin, a Helena CPA, to act as successor conservator for J.R.

¶11    In its October 3, 2007 Order appointing Shevlin, the court stated: "Shevlin shall have all powers granted under law to act as conservator, specifically, but not limited to,

3

those powers set forth in [§§] 72-5-427 and -428, MCA." The court also authorized Shevlin to sell J.R.'s Helena condo and to expend whatever monies were necessary for J.R.'s direct care. The court prohibited Shevlin from providing any money to J.R.'s family members "unless it is for reimbursement for the direct care of [J.R.]."

¶12 During his conservatorship, Shevlin arranged for the sale of J.R.'s condo and oversaw the packing and shipping of much of J.R.'s personal property to J.R. in Massachusetts. However, many of the problems that had plagued Nickol throughout her term as conservator persisted throughout Shevlin's conservatorship. Other relevant facts regarding these and other problems with the conservatorship will be set out more fully where necessary in our discussion of the issues presented.

¶13 On June 16, 2009, several of J.R.'s family members, including daughters Robin and Cheryl, J.R.'s brother William and his sister Betty, filed as "Interested Persons" a Petition for Orders Subsequent to Appointment. The petitioners asked the court to transfer the conservatorship to Massachusetts, to implement a trust and long-term-care plan recommended by J.R.'s Massachusetts legal counsel, and to order that Shevlin's conservatorship fees and attorney's fees be returned to J.R. because of Shevlin's failure to properly perform his fiduciary duties. In his response to the petition, Shevlin requested that the court enjoin petitioners from interfering with the performance of his duties. Shevlin also sought clarification from the court regarding portions of its prior order naming him as conservator. The petitioners subsequently amended their petition adding claims of negligence and breach of fiduciary duty against Shevlin.

¶14 On October 19, 2009, J.R. filed a Motion for the Removal of Conservator and Termination of the Conservatorship alleging deficiencies in Shevlin's performance as conservator. In addition, J.R. pointed out that his assets are dwindling rapidly because of the multiple parties involved in maintaining a long-distance conservatorship.

¶15 These matters were heard by the District Court over three days, February 16, 2010, March 9, 2010, and March 10, 2010. On April 27, 2010, the court entered its Findings of Fact, Conclusions of Law and Order wherein the court removed Shevlin as conservator; appointed J.R.'s brother William as successor conservator; approved Shevlin's accountings; approved the sale of J.R.'s condo; dismissed with prejudice the claims of breach of fiduciary duty and negligence brought by the petitioners against Shevlin; and ordered payment from the conservatorship's assets of Shevlin's attorney's fees incurred in defending this action. The order further provided that the successor conservator could petition the court for transfer of the conservatorship to Massachusetts.

¶16 J.R. now appeals the District Court's decision.

## Standard of Review

¶17 We review a district court's findings of fact to determine whether those findings are clearly erroneous. *In re Estate of Berthot*, 2002 MT 277, ¶ 21, 312 Mont. 366, 59 P.3d 1080 (citing *In re Eggebrecht*, 2000 MT 189, ¶ 18, 300 Mont. 409, 4 P.3d 1207; *In re Estate of Bolinger*, 1998 MT 303, ¶ 29, 292 Mont. 97, 971 P.2d 767). We review a district court's conclusions of law to determine whether that court's interpretation of the law is correct. *Berthot*, ¶ 21.

## Issue 1.

¶18    *Whether the District Court erred in dismissing J.R.'s claims of breach of fiduciary duty and negligence because J.R. did not offer expert testimony.*

¶19    The District Court dismissed J.R.'s claims of breach of fiduciary duty and negligence against Shevlin because J.R. did not provide expert testimony to establish the standard of care, whether that standard was breached, and whether any such breach caused the injury and damages about which J.R. complained. J.R. argues on appeal that this was error because expert testimony is not required to prove breach of a fiduciary duty; it is only required to prove professional negligence such as in cases of medical malpractice.

¶20    Shevlin argues on the other hand that it was necessary for J.R. to present expert testimony because Shevlin, as a CPA, is held to a higher standard of care than an ordinary person and expert testimony is necessary to establish that standard and any breach of that standard. Shevlin further argues that the standard of care may not be inferred, it must be established by expert testimony.

¶21    Section 72-5-423, MCA, provides that in the exercise of the conservator's powers, the conservator is to act as a fiduciary and observe the standards of care applicable to trustees as specified in Title 72, chapter 34, part 1. More specifically, under § 72-34-114, MCA, a trustee is charged with the duty of administering the trust "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person would use to accomplish the purposes of the trust as determined from the trust instrument." In addition, if a trustee has special skills, then the trustee "is held to the standard of the skills represented." Section 72-34-115, MCA; *Redies v. Cosner*, 2002

6

MT 86, ¶ 37, 309 Mont. 315, 48 P.3d 697. Thus, based on §§ 72-5-423 and 72-34-115, MCA, a conservator with special skills also must be held to the standard of the skills represented. *See In re Guardianship of Saylor*, 2005 MT 236, ¶ 14, 328 Mont. 415, 121 P.3d 532 ("Conservators are thus under the same duties as trustees.").

¶22 In addition, this Court noted the following regarding "special skills":

> "Professional persons in general, and those who undertake any work calling for special skill, are required not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability. Most of the decided cases have dealt with surgeons and other doctors, but the same is undoubtedly true of dentists, pharmacists, psychiatrists, veterinarians, lawyers, architects and engineers, *accountants*, abstractors of title, and many other professions and skilled trades." [Emphasis added.]

*Carlson v. Morton*, 229 Mont. 234, 239, 745 P.2d 1133, 1137 (1987) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 32 (W. Page Keeton ed., 5th ed., West 1984)); *see also Romans v. Lusin*, 2000 MT 84, ¶ 17, 299 Mont. 182, 997 P.2d 114 ("The Restatement (Second) of Torts § 229A (1965), provides that 'one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade . . . .' ").

¶23 In its October 3, 2007 Order wherein the District Court appointed Shevlin as conservator, the court pointed out that it was familiar with Shevlin and noted that not only was Shevlin a CPA, he possessed expertise in the area of estate planning. And later, in its April 27, 2010 Findings of Fact, Conclusions of Law and Order, the District Court pointed out that

> Shevlin is a Certified Public Accountant practicing in Helena with the firm of Junkermier, Clark, Campanella, Stevens, P.C. (JCCS). Shevlin

is a shareholder and member of the JCCS Board of Directors. Shevlin has spen[t] over 35 years working in public accounting. He has extensive experience with tax preparation and supervision. Shevlin also devotes a portion of his practice to estate planning and business consulting. Shevlin spends approximately 41 percent of his chargeable time engaged in professional advisory services, including estate planning and long-term financial care plans for the elderly.

Clearly the court believed that Shevlin had special skills that the court expected him to use in his fiduciary capacity as conservator of J.R.'s estate.

¶24     This Court stated in *Carlson* that " '[s]ince juries composed of laymen are normally incompetent to pass judgment on questions [regarding what standard to apply when special skills are employed], . . . it has been held in the great majority of malpractice cases that there can be no finding of negligence in the absence of expert testimony to support it . . . .' " *Carlson*, 229 Mont. at 239, 745 P.2d at 1137 (quoting Keeton, *Prosser and Keeton on the Law of Torts* at § 32)).

¶25     Reading § 72-5-423, MCA, together with §§ 72-34-114 and -115, MCA, we conclude that if, as here, a conservator is appointed in reliance on his or her special skills,[1] then an alleged breach of fiduciary duty involving those special skills requires expert testimony to establish the standard of care for the exercise of those skills, whether that standard was breached, and whether any such breach caused the injury and damages about which the protected person complains.

---

[1]     While § 72-34-115(2), MCA, is framed in terms of a "trustor" appointment, we conclude that a court effectively stands in the shoes of the trustor in appointing a conservator for a protected person—that is, in selecting the conservator, the trial court is relying on the special skills of the person to be appointed.

¶26   However, even if the conservator possesses special skills, but the alleged breach of fiduciary duty does not involve those skills, but rather, involves only the "care, skill, prudence, and diligence" that any prudent person would possess, then expert testimony is not required to establish that standard of care inasmuch as the "prudent person" standard is set forth in § 72-34-114, MCA.

¶27   Here, the District Court erred in dismissing J.R.'s claims of breach of fiduciary duty and negligence on the ground that J.R. did not offer expert standard-of-care testimony. J.R.'s allegations did not involve Shevlin's special skills as a CPA (which would require expert standard-of-care testimony), but rather, were simply that Shevlin failed to exercise the care, skill, prudence, and diligence that any prudent person would possess (a standard of care which does not require expert testimony). On the record before us, however, we conclude that the court's error was harmless because, as discussed *infra*, J.R. failed to provide sufficient evidence to prove that Shevlin breached even this lesser, prudent person standard of care.

¶28   Accordingly, we affirm the District Court's decision to dismiss J.R.'s claims of breach of fiduciary duty and negligence against Shevlin

**Issue 2.**

¶29   *Whether the District Court's ultimate finding that the conservator appropriately managed J.R.'s assets and estate was erroneous.*

¶30   J.R. claims that the District Court erred in finding that Shevlin's management of J.R.'s estate was "appropriate" because: (1) the court removed Shevlin as conservator; (2) the court used the wrong standard; (3) Shevlin failed to adequately provide for J.R.;

9

(4) Shevlin failed to file an inventory; (5) Shevlin filed late and inadequate accountings; (6) Shevlin sold some of J.R.'s property to himself, and (7) Shevlin charged exorbitant fees. We address each of J.R.'s assertions in turn.

### 1. Removal of Shevlin as conservator

¶31 J.R. contends that the fact that the court removed Shevlin as conservator is "strong evidence that Shevlin did breach his fiduciary duty." Contrary to J.R.'s contentions, the District Court determined that because of the continued bickering of J.R.'s children and step-children, and the continuing pattern of interference with the conservatorship by Robin, the court believed it to be in the best interests of all parties to appoint J.R.'s brother William as conservator. Thus, Shevlin's removal as conservator is evidence of nothing more than the lack of cooperation Shevlin received from J.R.'s family.

### 2. The court's use of the wrong standard

¶32 The District Court determined that Shevlin's management of the conservatorship was "appropriate" because he did what was ordered by the court in its October 2007 Order. J.R. claims that rather than a standard that Shevlin acted "appropriately," the correct standard is whether Shevlin failed to use the care, skill and diligence of a prudent person. J.R. also points out that under § 72-5-423, MCA, and §§ 72-34-114 and -115, MCA, a conservator has the same duty to use any special skills he or she possesses as does a trustee.

¶33 This is the same argument that Shevlin made in Issue 1 with which we expressed our agreement. And, as we indicated in Issue 1, not only did J.R. fail to provide the expert testimony needed to establish that Shevlin breached the standard of care for his

10

special skills as a CPA, J.R. failed to provide sufficient evidence that Shevlin breached the prudent person standard of care. Thus, the District Court's determination that Shevlin's management of the conservatorship was "appropriate" was not error.

### 3. Failure to provide for J.R.

#### a. Reimbursement for J.R.'s care

¶34 J.R. complains that Shevlin failed to provide funds for J.R.'s care, noting that Shevlin only directly provided $2000 to J.R. J.R. cites to § 72-5-428, MCA, which provides for reimbursement to any person for expenditures for services rendered to a protected person, or when reasonable to expect they will be performed.

¶35 In its October 3, 2007 Order in this matter, the District Court expressed concern with the amount of money Robin wanted to charge for caring for J.R. in her home. Thus the court stipulated that no money was to be provided to any of J.R.'s family members unless the expenditure was shown to be for J.R.'s direct care.

¶36 Consequently, Shevlin requested that Robin send him copies of various household bills from before J.R. moved in with her so that Shevlin could determine a baseline usage of utilities and other expenses to set an appropriate amount for reimbursement. While Robin provided a few current bills, she refused to provide any past bills. Shevlin would have provided reimbursement to Robin had Robin shown that the expenditures were solely for J.R.'s direct care. But, because of the earlier complaints by other family members, and the District Court's Order, it was not reasonable for Shevlin to just assume that all money sent to Robin would be used for J.R.'s direct care. And, because Robin moved J.R. to Massachusetts, Shevlin had no other way to verify that the funds he sent

11

would be used for J.R.'s direct care other than through bills and receipts received from Robin or J.R.

¶37    Shevlin did pay J.R.'s monthly credit card bill even though Robin stopped sending receipts for the expenses on the credit card statements. At the hearing in this matter, Robin admitted that she or J.R. had been reimbursed for all of J.R.'s expenses except for $100 for a lamp repair.

¶38    J.R. also complained that he was constantly embarrassed by not having ready cash. Shevlin agreed to send $200 per month if J.R. or Robin would send him the corresponding receipts. This system worked for only a few months before Robin insisted it was too much trouble to keep track of the receipts.

*b. Condo rental and sale*

¶39    The District Court's order authorized Shevlin to sell J.R.'s condo. Based on the advice of two Helena real estate agents, Shevlin initially listed the condo at $234,000. Prior to that listing, Shevlin had received a cash offer for the condo at $170,000. Shevlin rejected that offer as being below the fair market value of the property. Nevertheless, Shevlin negotiated with the real estate agents to exclude prior potential buyers from the listing agreements.

¶40    One of the real estate agents testified at the hearing that he had difficulties marketing the property due to significant structural problems with the property, problems with the common area around the property, and the slump in the nationwide housing market that began in 2007. The asking price was eventually reduced and the condo sold in December 2009, netting J.R. only $137,000.

¶41 The District Court noted in its order that "[i]n retrospect, it certainly would have solved a lot of problems if the [initial cash offer] had been accepted. However, that conclusion comes from the application of hindsight some three years after the fact." *See* § 72-34-114(3), MCA (compliance with the prudent investor rule is not to be determined by hindsight).

¶42 J.R. also complains that Shevlin should have rented the condo during the legislative session as J.R. had done in years past. J.R. blames the failure to rent the condo on the fact that Shevlin sold some of J.R.'s furnishings to himself. However, Shevlin pointed out that the legislative session was from January to April, 2009, and neither Robin nor J.R. mentioned renting the condo until the end of 2008, long after a moving van full of J.R's furniture and personal property was sent to J.R. in Massachusetts.

¶43 Furthermore, as Shevlin pointed out, the objective was to sell the condo, and when the condo was put on the market in September 2008, the real estate agents advised Shevlin that it would not show well if it was occupied by renters.

### c. The trust

¶44 J.R.'s Massachusetts legal counsel, Paula Almgren, recommended that an "intentionally defective grantor trust" be set up for J.R. that would deplete J.R.'s assets and make him eligible for veteran's benefits of up to $2000 per month and Massachusetts healthcare benefits which would pay up to 60 hours of home health care for J.R. J.R. faults Shevlin for not placing J.R.'s assets into this irrevocable trust.

¶45 Almgren discussed the trust with Shevlin and provided him with a copy of the trust she proposed. Shevlin rejected the trust because it violated specific terms of the

court's Order. The trust named Almgren and Robin as co-trustees and gave them "sole and unfettered discretion" to distribute the entire principal of the trust to Robin and Cheryl during J.R.'s lifetime. Thus, Shevlin had no assurance that the funds in the trust would be used for J.R.'s direct care.

### d. VA benefits

¶46 J.R. is a veteran of the United States Navy and is potentially eligible for veteran's pension benefits. J.R. complains that Shevlin did not seek VA benefits on his behalf. J.R. also faults Shevlin for refusing to fund the trust with J.R.'s assets claiming that it delayed J.R.'s eligibility for receiving VA benefits.

¶47 Shevlin tried to apply for VA benefits for J.R., but the VA does not recognize conservator status without the protected person's signed consent. Because neither J.R. nor Robin would give Shevlin the necessary authority to communicate with the VA, Shevlin could not proceed.

¶48 J.R. could access his VA benefits once his assets were reduced to $80,000 or less. J.R. faults Shevlin for failing to pay a bill from one of J.R.'s legal counsel, Stefan Wall, in 2007 that would have brought J.R.'s assets below the $80,000 figure. J.R. claims that failing to pay the bill delayed J.R.'s receipt of VA benefits by one year. Contrary to J.R.'s claim, Wall did not submit his bill to Shevlin until June 2008. Along with the bill, Wall sent his apology for failing to deliver it sooner citing the press of business. Shevlin paid the bill shortly after receiving it.

¶49 The court noted that Robin proceeded to establish eligibility for VA benefits for J.R. and obtained at least one monthly pension payment on J.R.'s behalf in the amount of

14

$1,359. However, Robin placed the check in a special account and refused to provide Shevlin or the court with an accounting of the use of those funds.

### 4. Inventory and personal property

¶50 Section 72-5-424, MCA, provides that within 90 days of appointment, a conservator is to file with the court a complete inventory of the estate of the protected person. The purpose of the 90-day requirement is to "furnish a means by which the conservator's management may be checked and the accounts verified." *Redies*, ¶ 20. However, the conservator has "discretion in deciding what to include and how to value the items in the estate. A conservator [need not] write down every half bar of soap sitting on a sink." *Redies*, ¶ 22.

¶51 J.R. complains that an inventory of his personal property was not done by either conservator. Shevlin admits that he did not file an inventory of J.R.'s personal property. And, while Nickol filed an Inventory of Conservator in March 2007, it did not include J.R.'s personal property.

¶52 Nevertheless, Shevlin points out that J.R.'s personal property was well known to Robin and that she compiled extensive lists of the items she wanted sent to J.R. in Massachusetts. In fact, Robin testified: "I just knew the house very well; I knew everything in each room, and I have photographs." Shevlin further points out that J.R.'s daughter Cheryl was supposed to help sort and pack J.R.'s personal property, but she contacted him shortly before the movers arrived to inform him that she would not be there. Consequently, Shevlin had to undertake the sorting and packing of J.R.'s personal property on his own.

¶53 At Robin's direction, Shevlin shipped most of J.R.'s personal belongings to him in July 2008. He sent the remaining property requested by J.R. and Robin in January 2010. The remainder of the property was to be donated to charity or discarded. The donated property was receipted for tax purposes.

¶54 We do not condone Shevlin's failure to file a complete inventory as required by § 72-5-424, MCA. Here the only property not inventoried was J.R.'s personal property. While Shevlin should have timely performed and filed that inventory, we agree with the trial court that his failure to do so under the facts of this case was not grounds for his removal.

### 5. *Late and inadequate accountings*

¶55 J.R. complains that the accountings filed by Shevlin were late and that they were inadequate or incomplete. Although the District Court had ordered Shevlin to file annual accountings, he waited until May 14, 2009, more than 19 months after his appointment as conservator, before filing the first accounting. This accounting covered the period from November 5, 2007, through January 5, 2009. The second accounting provided by Shevlin covered the period from January 5, 2009, through January 5, 2010, and was filed on February 8, 2010. The District Court expressed its disappointment that Shevlin did not file an accounting within one year of his appointment as conservator, but the court pointed out that there was no adverse impact to J.R.

¶56 As to the completeness of the accountings, Shevlin explained that various bank statements and tax returns were not provided to Shevlin by Robin or J.R. so they could not be included. Shevlin did submit independent documentation with the accountings

16

including his work papers supporting each accounting; however, J.R. objected to these documents and they were withdrawn. Nevertheless, the court noted that each of the accountings filed by Shevlin was "supplemented by detailed itemization of receipts and disbursements."

¶57 Again, we cannot find fault with the District Court's determinations based on the facts here.

### 6. Sale of property to Shevlin

¶58 J.R. complains that Shevlin bought some of J.R.'s personal property to use in rental properties owned by Shevlin. Shevlin admits that he purchased a few items for fair market value, but that these items were ones that Robin and J.R. told him to discard or to try to sell.

¶59 We agree with J.R. that a conservator has a duty to avoid a conflict of interest, *see* § 72-34-105, MCA, and that obtaining this property for Shevlin's personal use was entirely improper. Nevertheless, as the court stated, J.R. did not introduce any evidence that Shevlin sold the property to himself at less than market value.

¶60 J.R. also complains that at the time of the hearing, Shevlin was holding some of J.R.'s personal property in Shevlin's garage. Shevlin points out that these items had to be removed from J.R.'s condo at the time of the condo's sale and that it was necessary to store the items until he received further instructions from J.R. and Robin on what to do with the items.

### 7. Exorbitant fees

17

¶61   J.R. claims that Shevlin paid himself exorbitant fees as conservator for attending to minor details and that he never received any billing statements detailing Shevlin's fees.

¶62   Shevlin billed the conservatorship his regular hourly rate which is determined by JCCS and which ranged from $155 per hour when Shevlin was first appointed conservator to $180 per hour when Shevlin was removed as conservator. Shevlin points out that J.R. was a client of JCCS for many years prior to the conservatorship, thus J.R. would have been familiar with JCCS's billing practices. In addition, the court pointed out that J.R. and Robin hired various counsel throughout the conservatorship proceedings at hourly rates ranging from $165 to $225 per hour.

¶63   Contrary to J.R.'s assertion that he never received any billing statements, in their Petition for Orders Subsequent to Appointment filed June 16, 2009, the petitioners, which included Robin, point out various items from Shevlin's billing statements with which they disagreed. Consequently, it is evident that the billing statements were received. Moreover, many of the fees that J.R. now takes issue with were the fees Shevlin charged for sorting and packing J.R.'s personal belongings. Shevlin testified that although he did bill the conservatorship his normal hourly rate, his billing statements reflect that he did not bill for all of the time spent packing up J.R.'s condo.

¶64   Furthermore, J.R. complains on one hand that Shevlin did not do enough to inventory and ship J.R.'s personal property, yet on the other hand he complains that Shevlin charged exorbitant fees for doing so. We also note that it would not have been necessary for Shevlin to spend time packing J.R.'s personal belongings if J.R.'s family

18

members had participated in the packing and shipping of J.R.'s personal property as promised.

### *Conclusion*

¶65    Because we have determined that the trial court is in the best position to observe and judge the credibility of witnesses, we do not "second guess the district court's determination regarding the strength and weight of conflicting testimony." *Brimstone Mining, Inc. v. Glaus*, 2003 MT 236, ¶ 20, 317 Mont. 236, 77 P.3d 175 (quoting *Double AA Corp. v. Newland & Co.*, 273 Mont. 486, 494, 905 P.2d 138, 142 (1995)).

¶66    With the exception of Shevlin's failure to compile an inventory of J.R.'s personal property and the sale of some of J.R.'s personal property to himself, we agree with the District Court that Shevlin substantially complied with the District Court's Order regarding the conservatorship.

¶67    Accordingly, we hold that the District Court's ultimate finding that Shevlin appropriately managed J.R.'s assets and estate was not clearly erroneous.

### Issue 3.

¶68    *Whether the District Court erred in discharging the conservator without liability.*

¶69    Although the District Court found fault with some of the things Shevlin did as conservator, the court determined that they were "minor errors" or "insubstantial" and that Shevlin corrected or compensated for all of them. The court further found that ultimately Shevlin performed his duties as conservator in the manner the court anticipated in its appointment and that the conservatorship had not been damaged through Shevlin's actions.

¶70 J.R. contends on appeal that this was error by the District Court because the very fact that the court removed Shevlin as conservator "implicitly suggests" that there was "good cause" for Shevlin's removal and, according to J.R., is strong evidence that Shevlin breached his fiduciary duty. Thus J.R. argues that the court should have ordered Shevlin to reimburse J.R. for the fees which Shevlin paid to himself. In support of this proposition, J.R. cites *In re Allard*, 49 Mont. 219, 225, 141 P. 661, 664 (1914) (the conservatorship statute "contemplates a faithful stewardship. While a mere technical breach of duty which does not result in injury to the ward's estate will not ordinarily justify a court in withholding compensation altogether, a flagrant violation of the duties of the trust will do so.").

¶71 Contrary to J.R.'s assertions, the District Court did not remove Shevlin as conservator because he committed a "flagrant violation" of his duties or even that he committed any violation of his duties. Instead, the court pointed to the continued bickering of J.R.'s children and step-children, and the continuing pattern of Robin interfering with the conservator's efforts devoted to J.R.'s conservatorship, both before and after Shevlin's appointment, as the reason for Shevlin's removal. The court stated: "It seems that some of [J.R.'s] children even refuse to acknowledge the existence of the conservatorship and have failed to cooperate with it. In short, Shevlin was placed in a very difficult situation and did not receive the full cooperation that he should have been entitled to from [J.R.'s] children." In Shevlin's place, the court appointed J.R.'s brother William as successor conservator in the hope that he would be better able to work with the parties involved.

¶72    As to Shevlin's fees, § 72-5-432, MCA, provides:

> **Compensation and expenses.** If not otherwise compensated for services rendered, any visitor, lawyer, physician, conservator, or special conservator appointed in a protective proceeding is entitled to reasonable compensation from the estate.

In this case, the District Court determined, and we agree, that Shevlin's fees were reasonable as Shevlin's management of J.R.'s assets and estate was appropriate to provide for J.R.'s care.

¶73    Accordingly, we hold that the District Court did not err in discharging Shevlin without liability.

### Issue 4.

¶74    *Whether the District Court abused its discretion in ordering payment of the conservator's attorney's fees from the conservatorship's assets.*

¶75    J.R. argues that this litigation was brought "because of the inexcusable conduct on the part of the conservator . . . ."  Thus, J.R. maintains that because this litigation is completely irrelevant to the proper administration of the conservatorship, he should be reimbursed for the fees paid to Shevlin's attorneys to defend Shevlin in this case.

¶76    Shevlin argues on the other hand that because he continued to receive communications from Robin and from J.R.'s Massachusetts counsel that Shevlin interpreted as threatening, it was necessary for Shevlin to employ counsel to advise him regarding the District Court's Order appointing him as conservator and to seek instruction from the court.

¶77    We review a District Court's grant or denial of attorney's fees for an abuse of discretion.  *Prescott v. Innovative Resource Group, LLC*, 2010 MT 35, ¶ 16, 355 Mont.

21

220, 225 P.3d 1253. This Court has repeatedly held that absent a contractual agreement or statutory provision, the prevailing party in a civil action is not entitled to recover attorney's fees. *In re Estate of Berthot*, 2002 MT 277, ¶ 55, 312 Mont. 366, 59 P.3d 1080 (citing *In re Estate of Dern Family Trust*, 279 Mont. 138, 154, 928 P.2d 123, 133 (1996); *Thompkins v. Fuller*, 205 Mont. 168, 186, 667 P.2d 944, 954 (1983)). However, this case is one in which statutory provisions governing the awarding of attorney's fees and costs do exist.

> (3) A conservator, acting reasonably in efforts to accomplish the purpose for which the conservator was appointed, may act without court authorization or confirmation to:
>
> .   .   .
>
> (w) employ persons, including attorneys, . . . even though they are associated with the conservator, to advise or assist the conservator in the performance of administrative duties . . . ; [and]
>
> (x) prosecute or defend actions, claims, or proceedings in any jurisdiction for the protection of estate assets and of the conservator in the performance of the conservator's duties . . . .

Section 72-5-427, MCA.

¶78 In this case, the District Court found that a large number of Shevlin's fees and those of his counsel were attributable to the failure of some of J.R.'s children to cooperate with or even recognize the existence of the conservatorship. Thus, contrary to J.R.'s contention that the attorney's fees were used to defend Shevlin, the attorney's fees were expended to protect the conservatorship. Accordingly, we hold that, on that basis, the District Court did not abuse its discretion in ordering that Shevlin's attorney's fees be paid from the conservatorship assets.

¶79 Affirmed.

22

/S/ JAMES C. NELSON


We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ JIM RICE