DA 11-0089 and DA 11-0090

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 219

IN THE MATTER OF THE ADOPTION OF
S.R.T., a/k/a S.R.F.,

A Minor Child,

IN THE MATTER OF THE ADOPTION OF
M.F.M.,

A Minor Child.

| | |
|---|---|
| APPEAL FROM: | District Court of the First Judicial District, In and For the County of Lewis and Clark, Cause No. CDA-2009-68 and CDA-2009-69 Honorable Kathy Seeley, Presiding Judge |

COUNSEL OF RECORD:

For Appellant:

Linda Osorio St. Peter, St. Peter Law Offices, P.C., Missoula, Montana

For Appellee:

Richard L. Parish, Harlen & Parish, P.C., Helena, Montana

Submitted on Briefs: August 10, 2011

Decided: September 6, 2011

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 This case involves adoption proceedings for two biological siblings, M.F.M., born 2004, and S.R.T., born 2006. Biological mother executed a waiver of her parental rights, a relinquishment of the children, and consent to adoption in December 2008. Subsequently, the children were placed in the legal care of Mother's aunt (Aunt) and uncle (Uncle), jointly referred to as Guardians. Guardians later arranged for the adoption of the children by C.T. (Adoptive Father) and M.T. (Adoptive Mother). Guardians relinquished the children, who began residing with the Adoptive Parents on October 31, 2009. On May 3, 2010, Guardians moved to have their relinquishment and consent to adoption set aside, claiming they had been provided a fraudulent pre-placement evaluation. The First Judicial District Court denied the motion. Guardians appeal. We affirm.

## ISSUE

¶2 A restatement of the dispositive issue on appeal is:

¶3 Did the District Court err in denying Guardians' motion to set aside their relinquishment and consent to adoption?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 In December 2008, Mother executed an "Affidavit of Birth Mother's Waiver of All Parental Rights, Relinquishment of Child, and Consent to Adoption" for each of her daughters, M.F.M. and S.R.T. Mother voluntarily transferred permanent legal and physical custody, with the right to consent to adoption, to Guardians. Subsequently, the

putative fathers were contacted or notified by publication for the purpose of terminating their parental rights.

¶5 In early 2009, C.T. and M.T. began working with Global Adoption Services (GAS) in hopes of adopting a child. To this end, in May 2009, GAS prepared a pre-placement evaluation for them. This evaluation was not specific to any child but rather was a detailed description of the Adoptive Parents and provided information that would be of interest to any guardian or biological parent looking for adoptive parents.

¶6 At some time later in 2009, Guardians contacted GAS seeking to find an adoptive placement for the children. GAS advised Guardians that C.T. and M.T. were interested in adoption and provided Guardians a copy of the pre-placement evaluation prepared by GAS. GAS introduced Guardians, Adoptive Parents, and the children on August 29, 2009. Subsequently, the parties spent time together and ultimately mutually agreed to the adoption. Guardians then decided they did not want to pursue the adoption through GAS, but rather wanted a direct parental adoption between themselves and the Adoptive Parents. To this end, Guardians transferred physical custody of the children to Adoptive Parents on October 31, 2009, and on December 8, 2009, Guardians executed voluntary relinquishments filed with the District Court. While the children continued visiting Guardians they have resided with Adoptive Parents since October 31, 2009.

¶7 Following the voluntary relinquishments, the court granted temporary legal custody to Adoptive Parents on December 15, 2009. On March 17, 2010, the rights of Biological Mother, putative fathers, and Guardians were terminated and the court declared the children legally free for adoption. On May 3, 2010, Guardians moved the

District Court to have their relinquishment and consent set aside on the grounds that Adoptive Parents had provided a fraudulent pre-placement evaluation that did not meet the statutory requirements set out in the Montana Adoption Act.

¶8　Guardians argued that the pre-placement evaluation was not conducted by a licensed social worker; rather, it was prepared by a college intern. Guardians also asserted the pre-placement evaluation failed to provide the religious affiliation and complete medical history of Adoptive Parents. Additionally, Guardians complained that the pre-placement evaluation did not specifically address the appropriateness of placing S.R.T. and M.F.M. with Adoptive Parents and incorrectly or deceptively indicated Adoptive Parents' ownership of recreational property. They also maintained that they did not receive a "valid, true, and correct pre-placement evaluation" when they signed their relinquishments.

¶9　Adoptive Parents objected to the motion, citing the statutory intent to provide stability and predictability to the adoption process and to emphasize the needs of the children. They denied there was any fraud in the process, and maintained that absent fraud, the District Court could not set aside the relinquishment or consent to adoption.

¶10　The District Court conducted hearings on October 8 and November 30, 2010, at which it heard testimony from the Guardians, the Adoptive Parents and other witnesses. On January 21, 2011, the court entered its order denying Guardians' motion to set aside the relinquishment. It is from this order that Guardians appeal.

**STANDARD OF REVIEW**

4

¶11 A parent or legal guardian's right to revoke a relinquishment and consent to adoption is dictated by statute. Section 42-2-410, MCA. A district court's interpretation and application of a statute is a conclusion of law. We review a district court's conclusions of law for correctness. *Kulstad v. Maniaci*, 2009 MT 403, ¶ 6, 353 Mont. 467, 221 P.3d 127.

¶12 We review a district court's findings of fact to determine whether those findings are clearly erroneous. *In re J.R.*, 2011 MT 62, ¶ 17, 360 Mont. 30, 252 P.3d 163.

## DISCUSSION

¶13 *Did the District Court err in denying Guardians' motion to set aside their relinquishment and consent to adoption?*

¶14 The Montana Adoption Act (Act), Title 42, chapters 1-10, MCA, sets forth the policy and procedures for adoptions in Montana. The Act, among other things, specifies that the "well-being of the adopted child is the main objective in the placement of a child for adoption." Section 42-1-102(3), MCA. It provides the rights and responsibilities of all parties in the adoption proceeding, § 42-1-108, MCA, it offers protection and notice provisions for putative fathers, §§ 42-2-201 through 230, MCA, it dictates how voluntary relinquishment of parental rights and consent to adoption may be effected, §§ 42-2-401 through 422, MCA, and it sets forth the information that must be disclosed by the parties to one another, §§ 42-3-101 and 102, MCA.

¶15 Also addressed in the Act is revocation of a relinquishment and consent to adoption. Section 42-2-410(2), MCA, specifically states: "A relinquishment may not be revoked if an order has been issued terminating parental rights." It is undisputed that

Guardians moved to revoke their relinquishments and consents to adoption *after* the District Court had issued its order terminating Guardians' parental rights. As a result, Guardians rely on § 42-2-417, MCA, and claim their consent was fraudulently obtained by their reliance on a pre-placement evaluation that omitted statutorily-mandated information. Section 42-2-417(1), MCA, provides:

> The court shall set aside a relinquishment and consent to adopt if the individual who executed the relinquishment and consent establishes: (a) by clear and convincing evidence, before a decree of adoption is issued, that the consent was obtained by fraud or duress . . . .

¶16 Guardians assert Adoptive Parents committed both actual and constructive fraud. The elements of actual fraud include: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge that it is false, (5) the speaker's intent that the representation will be relied upon by the hearer to his detriment, (6) the hearer's ignorance of the falsity of the representation, (7) the hearer's reliance upon its truth, (8) the hearer's right to rely upon it, and (9) the hearer's consequent injury as the result of his reliance. *Durbin v. Ross*, 276 Mont. 463, 469, 916 P.2d 758, 762 (1996).

¶17 Constructive fraud, on the other hand, consists of: (1) any breach of duty that, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under the person in fault by misleading another person to that person's prejudice or to the prejudice of anyone claiming under that person; or (2) any act or omission that the law especially declares to be fraudulent, without respect to actual fraud. Section 28-2-406, MCA.

6

¶18 While arguing there were numerous flaws with the pre-placement evaluation provided by Adoptive Parents to Guardians, Guardians' most significant complaints pertain to the evaluation's failure to disclose that Adoptive Father has a medical condition called "benign essential tremor" (BET), and that Adoptive Mother experienced a spinal injury several years ago and is a member of the Church of the Latter Day Saints (LDS). Guardians assert that the pre-placement evaluation provided by Adoptive Parents did not contain this critical information, and that it was not until after the relinquishment documents had been executed and filed that Guardians discovered these important facts. They insist, therefore, that their consent and relinquishment were obtained by fraud and they should be allowed to revoke them and have the children returned to them.

¶19 We note that, among other things, § 42-3-204, MCA, identifies religious affiliation and physical health condition as information that, if available, should be contained in a pre-placement evaluation of a prospective adoptive parent.

¶20 In response to these claims of fraudulent misrepresentation, Adoptive Father testified that his medical condition is quite obvious and he had discussed it with Guardians shortly after meeting them. While identifying the condition as "familial tremor" rather than BET, Adoptive Father explained that it is a benign condition that simply causes his hands to shake. He stated he told Guardians that his father had the same condition.

¶21 The District Court concluded that Guardians presented no competent evidence from which to conclude that Adoptive Father's diagnosis of BET adversely impacted his ability to work, provide for his family, parent the children, or recreate with them as a

7

family. The court concluded there was no reason for this condition to have been identified in the health section of the pre-placement evaluation, and therefore its absence does not constitute fraud or misrepresentation.

¶22 Guardians also claimed that Adoptive Mother broke her back twice and failed to identify these injuries in the pre-placement evaluation. Adoptive Mother, however, testified she had never broken her back and was not debilitated in any way. She described a compression injury of her spine received in an automobile accident years earlier and a more recent bruised spine from a horseback riding accident, but testified that she was healthy and without physical limitations. The District Court determined that Guardians presented no evidence of their claims that Adoptive Mother was injured to the extent that she was unable to play with the children and move about freely.

¶23 Guardians further claimed the pre-placement evaluation was fraudulent in that it failed to identify Adoptive Mother as a member of the LDS church. Testimony established that Adoptive Father is not a member of the LDS church and Adoptive Mother is. The pre-placement evaluation did not mention the LDS church but reported that Adoptive Parents believed in God and prayer and hoped to teach their child[ren] the same.

¶24 The District Court heard testimony from the evaluator and owner of GAS, Cindi Peck, who explained that she felt it more useful to present the joint beliefs of the parties in the pre-placement evaluation than it would be to present their denominational differences. Peck also testified that she expressly asked Aunt if Guardians had a religious preference for the adoptive parents and Aunt claimed they did not. Aunt testified that no

8

such conversation took place. Guardians insisted, in the face of further conflicting testimony, they did not know Adoptive Mother was a Mormon until after they signed the consent and relinquishment. However, both Adoptive Mother and Peck testified as to specific occasions early in the Guardians and Adoptive Parents' relationship when Adoptive Mother and Aunt discussed Adoptive Mother's membership in the LDS church.

¶25 It is well established that "the trial court is in the best position to observe and judge the credibility of witnesses, [therefore] we do not 'second guess the district court's determination regarding the strength and weight of conflicting testimony.' " *J.R.*, ¶ 65. The District Court expressly found that Adoptive Mother and Peck's testimony was more credible than that of Guardians. It determined that Guardians presented no credible evidence that Adoptive Parents, or anyone else, misrepresented or concealed Adoptive Mother's religion. As a result, Guardians did not satisfy the elements of actual or constructive fraud.

¶26 We next address the Guardians' complaint that the pre-placement evaluation did not meet the requirements of § 42-3-204(4), MCA. Section 42-3-204(4), MCA, states:

> Prior to accepting physical custody of a child for purposes of adoption, a prospective adoptive parent must have the preplacement evaluation completed by the evaluator, and the evaluation must specifically address the appropriateness of placing the specifically identified child or children who will be the subject of the adoption proceedings with the prospective adoptive parent.

¶27 Adoptive Parents acknowledged that they did not have another pre-placement evaluation conducted after meeting Guardians and the children; therefore, there was no evaluation that specifically identified the children who were the subject of the adoption

proceedings. The District Court concluded that the absence of specific reference to the children in the pre-placement evaluation did not mislead or defraud Guardians at the time they signed their relinquishments. The court further determined that the purpose of the pre-placement evaluation is to determine the fitness and readiness of adoptive parents and the evidence presented showed the Adoptive Parents were both fit and ready. The District Court cited as support for its ruling, *Tyler v. Children's Home Society of Cal.*, 35 Cal. Rptr. 2d 291, 300. The *Tyler* Court stated:

> Relinquishments, once executed, must be relied upon in order to insure that children will not be forced out of one home and into another at the whims and caprice of emotionally upset and perhaps ill-advised persons. The state has expressed a strong policy in the necessity for giving effect to relinquishments, for to do otherwise would "open the door to practices which could conceivably discourage adopting parents from opening their hearts and homes to unwanted children . . . ."

¶28 Parties should strictly comply with the statutory requirements in adoption proceedings. However, to allow revocation of Guardians' relinquishments in this case—which would mean taking the children from what has been their home for nearly two years—solely because of a lack of specific reference to the children in the evaluation would be to elevate form over substance. As noted by the District Court, failure of Adoptive Parents to have a final § 42-3-204(4), MCA, pre-placement evaluation performed in no way constituted fraud upon or misrepresentation to the Guardians, who spent considerable time with Adoptive Parents and the children before they executed their relinquishments. If at any time Guardians believed Adoptive Parents were not ready, fit and able to be caring parents to these two children, they had ample opportunity to stop the adoption process. We therefore decline to set the relinquishments aside on this basis.

10

¶29 Guardians also challenged the value Adoptive Parents placed on their recreational property in Oklahoma, the Adoptive Parents' alleged failure to provide medical insurance for the children, and the Adoptive Mother's undisclosed intention to be employed outside the home. The District Court determined that each of these claims was without merit or did not constitute actual or constructive fraud. The court also stated that Guardians produced no independent evidence that they signed the relinquishments or placed the children for adoption as the result of pressure or duress.

¶30 The record supports the District Court's findings; therefore, its findings are not clearly erroneous. Moreover, the court's interpretation and application of the relevant statutes is correct. Guardians have failed to establish the existence of actual or constructive fraud by clear and convincing evidence. This being so, there is no basis under § 42-2-410, MCA, to set aside the relinquishments and consents given by Guardians.

**CONCLUSION**

¶31 For the foregoing reasons, we affirm the judgment of the District Court.

/S/ PATRICIA COTTER

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JIM RICE

11