**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

JUAN PINEDA-MORENO,
        *Defendant-Appellant.*

No. 08-30385

D.C. No.
1:07-CR-30036-PA
District of Oregon,
Medford

ORDER

Filed August 12, 2010

Before: Diarmuid F. O'Scannlain and N. Randy Smith,
Circuit Judges, and Charles R. Wolle,
Senior District Judge.*

Order;
Dissent by Chief Judge Kozinski;
Dissent by Judge Reinhardt

---

## ORDER

Judges O'Scannlain and N.R. Smith have voted to deny the petition for rehearing en banc, and Judge Wolle has so recommended.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

---

*The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa, sitting by designation.

The petition for rehearing en banc is DENIED.

---

Chief Judge KOZINSKI, with whom Judges REINHARDT, WARDLAW, PAEZ and BERZON join, dissenting from the denial of rehearing en banc:

Having previously decimated the protections the Fourth Amendment accords to the home itself, *United States* v. *Lemus*, 596 F.3d 512 (9th Cir. 2010) (Kozinski, C.J., dissenting from the denial of rehearing en banc); *United States* v. *Black*, 482 F.3d 1044 (9th Cir. 2007) (Kozinski, J., dissenting from the denial of rehearing en banc), our court now proceeds to dismantle the zone of privacy we enjoy in the home's curtilage and in public. The needs of law enforcement, to which my colleagues seem inclined to refuse nothing, are quickly making personal privacy a distant memory. 1984 may have come a bit later than predicted, but it's here at last.

The facts are disturbingly simple: Police snuck onto Pineda-Moreno's property in the dead of night and attached a GPS tracking device to the underside of his car. The device continuously recorded the car's location, allowing police to monitor all of Pineda-Moreno's movements without the need for visual surveillance. The panel holds that none of this implicates the Fourth Amendment, even though the government concedes that the car was in the curtilage of Pineda-Moreno's home at the time the police attached the tracking device. The panel twice errs in very significant and dangerous ways.

**1.** The opinion assumes that Pineda-Moreno's driveway was part of his home's curtilage, yet concludes that Pineda-Moreno had no reasonable expectation of privacy there. Curtilage is a quaint word most people are not familiar with; even among judges and lawyers, the word is seldom well understood. Yet, it stands for a very important concept because it

rounds out the constitutional protections accorded an individual when he is at home.

Curtilage comes to us by way of Middle English and traces its roots to the Old French *courtillage*, roughly meaning court or little yard. In modern times it has come to mean those portions of a homeowner's property so closely associated with the home as to be considered part of it. The walkway leading from the street to the house is probably part of the curtilage, and the stairs from the walkway to the porch almost certainly are, as is the porch where grandma sits and rocks most afternoons and watches strangers pass by. The attached garage on the side of the house is part of the curtilage, and so is the detached shed where dad keeps his shop equipment and mom her gardening tools—so long as it's not too far from the house itself. The front lawn is part of the curtilage, and the driveway and the backyard—if it's not too big, and is properly separated from the open fields beyond the house.

Whether some portion of property—the porch, the stairs, the shed, the yard, the chicken coop—is part of the curtilage is sometimes a disputed question. But once it is determined that something is part of the curtilage, it's entitled to precisely the same Fourth Amendment protections as the home itself. How do we know? Because the Supreme Court has said so repeatedly.

In *Oliver* v. *United States*, the Court said as follows:

> [O]nly the curtilage . . . warrants the Fourth Amendment protections that attach to the home. At common law, *the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life," and therefore has been considered part of home itself for Fourth Amendment purposes.* Thus, courts have extended Fourth Amendment protection to the curtilage.

466 U.S. 170, 180 (1984) (quoting *Boyd* v. *United States*, 116 U.S. 616, 630 (1886)) (emphasis added). Three years later, the Court reiterated the same view in *United States* v. *Dunn*, 480 U.S. 294, 300 (1987):

> [In *Oliver*] we recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether *an individual reasonably may expect that the area in question should be treated as the home itself*.

(Emphasis added). *See also Dow Chemical Co.* v. *United States*, 476 U.S. 227, 231 (1986) (citing *Oliver*, 466 U.S. at 170). There's no disputing that the Court considers the curtilage to stand on the same footing as the home itself for purposes of the Fourth Amendment.

While it can be unclear whether a particular portion of the homeowner's property is part of the curtilage, there's no doubt here because the government *concedes* that Pineda-Moreno's driveway is a part of his curtilage, and the panel expressly assumes that it is. *United States* v. *Pineda-Moreno*, 591 F.3d 1212, 1214-15 (9th Cir. 2010). Having made that assumption, *Oliver* and *Dunn* require the panel to "treat[ ] [it] as the home itself." *Dunn*, 480 U.S. at 300. Instead, the panel holds that Pineda-Moreno was required to separately establish a reasonable expectation of privacy in the curtilage. That—according to *Oliver* and *Dunn*—is like requiring the homeowner to establish a reasonable expectation of privacy in his bedroom. We are often reminded that we must follow Supreme Court precedent, *see, e.g.*, *Winn* v. *Ariz. Christian Sch. Tuition Org.*, 586 F.3d 649, 658-59 (9th Cir. 2009) (O'Scannlain, J., dissenting from denial of rehearing en banc), but the panel here forgets this advice.

The panel does cite *California* v. *Ciraolo*, 476 U.S. 207 (1986), but that case undermines its position. *Ciraolo* held

that a homeowner has no reasonable expectation of visual privacy in his property as to activities that might be seen from a low-flying airplane. The activity there in question—cultivation of marijuana—took place in the homeowner's yard, so the Court could have limited its discussion to the curtilage. Instead, *Ciraolo* quoted a passage from *Katz* v. *United States*, 389 US. 347, 361 (1967), to the effect that "a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited." *Ciraolo*, 476 U.S. at 215 (quoting *Katz*, 389 U.S. at 361). This passage applies equally to a person's yard as his porch and his bedroom window: If what you do in your home is visible to the public, you have no reasonable expectation that it will remain private. *Ciraolo* cites *Oliver* and follows its analysis by treating the curtilage and the home as exactly the same for Fourth Amendment purposes.

The panel's rationale for concluding that Pineda-Moreno had no reasonable expectation of privacy is even more worrisome than its disregard of Supreme Court precedent: According to the panel, Pineda-Moreno's driveway was open to the public in that strangers wishing to reach the door of his trailer "to deliver the newspaper or to visit someone would have to go through the driveway to get to the house." *Pineda-Moreno*, 591 F.3d at 1215. But there are many parts of a person's property that are accessible to strangers for limited purposes: the mailman is entitled to open the gate and deposit mail in the front door slot; the gas man may come into the yard, go into the basement or look under the house to read the meter; the gardener goes all over the property, climbs trees, opens sheds, turns on the sprinkler and taps into the electrical outlets; the pool man, the cable guy, the telephone repair man, the garbage collector, the newspaper delivery boy (we should be so lucky) come onto the property to deliver their wares, perform maintenance or make repairs. This doesn't mean that we invite neighbors to use the pool, strangers to camp out on the

lawn or police to snoop in the garage. *See United States* v. *Hedrick*, 922 F.2d 396, 400, 402 (7th Cir. 1991) (Cudahy, J., dissenting).

The panel authorizes police to do not only what invited strangers could, but also uninvited children—in this case crawl under the car to retrieve a ball and tinker with the undercarriage. But there's no limit to what neighborhood kids will do, given half a chance: They'll jump the fence, crawl under the porch, pick fruit from the trees, set fire to the cat and micturate on the azaleas. To say that the police may do on your property what urchins might do spells the end of Fourth Amendment protections for most people's curtilage.

The very rich will still be able to protect their privacy with the aid of electric gates, tall fences, security booths, remote cameras, motion sensors and roving patrols, but the vast majority of the 60 million people living in the Ninth Circuit will see their privacy materially diminished by the panel's ruling. Open driveways, unenclosed porches, basement doors left unlocked, back doors left ajar, yard gates left unlatched, garage doors that don't quite close, ladders propped up under an open window will all be considered invitations for police to sneak in on the theory that a neighborhood child might, in which case, the homeowner "would have no grounds to complain." *Id.*

There's been much talk about diversity on the bench, but there's one kind of diversity that doesn't exist: No truly poor people are appointed as federal judges, or as state judges for that matter. Judges, regardless of race, ethnicity or sex, are selected from the class of people who don't live in trailers or urban ghettos. The everyday problems of people who live in poverty are not close to our hearts and minds because that's not how we and our friends live. Yet poor people are entitled to privacy, even if they can't afford all the gadgets of the wealthy for ensuring it. Whatever else one may say about Pineda-Moreno, it's perfectly clear that he did not expect—

and certainly did not consent—to have strangers prowl his property in the middle of the night and attach electronic tracking devices to the underside of his car. No one does.

When you glide your BMW into your underground garage or behind an electric gate, you don't need to worry that somebody might attach a tracking device to it while you sleep. But the Constitution doesn't prefer the rich over the poor; the man who parks his car next to his trailer is entitled to the same privacy and peace of mind as the man whose urban fortress is guarded by the Bel Air Patrol. The panel's breezy opinion is troubling on a number of grounds, not least among them its unselfconscious cultural elitism.

**2.** After concluding that entering onto Pineda-Moreno's property and attaching a tracking device to his car required no warrant, probable cause, founded suspicion or by-your-leave from the homeowner, the panel holds that downloading the data from the GPS device, which gave police the precise locus of all of Pineda-Moreno's movements, also was not a search, and so police can do it to anybody, anytime they feel like it. *Contra United States* v. *Maynard*, No. 08-3030, slip op. at 19 (D.C. Cir. Aug. 6, 2010). Our panel relies on *United States* v. *Knotts*, 460 U.S. 276 (1983), a case from the early 1980s, which involved very different technology.

The *Knotts* Court refers to the device used there as a "beeper" and describes it as "a radio transmitter, usually battery operated, which emits periodic signals that can be picked up by a radio receiver." *Id.* at 277. The beeper helped police follow a vehicle by emitting a signal that got stronger the closer the police were to it. The Court considered the beeper to be an aid to following a vehicle through traffic: "The governmental surveillance conducted by means of the beeper in this case amounted principally to the following of an automobile on public streets and highways." *Id.* at 281. Individuals traveling on streets and highways can be seen by the public, so they have no reasonable expectation that they won't be fol-

lowed. The beeper helped the police follow the suspect more effectively—the way binoculars enhance the ability to see what is otherwise visible. But the beeper could perform no tracking on its own, nor could it record its location. If no one was close enough to pick up the signal, it was lost forever.

The electronic tracking devices used by the police in this case have little in common with the primitive devices in *Knotts*. One of the devices here used GPS satellites to pinpoint the car's location on a continuing basis—much like the electronic maps that are now popular in cars. The other type of device was, essentially, a cell phone that tracked the car's movements by its proximity to particular cell towers.

Beepers could help police keep vehicles in view when following them, or find them when they lost sight of them, but they still required at least one officer—and usually many more—to follow the suspect. The modern devices used in Pineda-Moreno's case can record the car's movements without human intervention—quietly, invisibly, with uncanny precision. A small law enforcement team can deploy a dozen, a hundred, a thousand such devices and keep track of their various movements by computer, with far less effort than was previously needed to follow a single vehicle. The devices create a permanent electronic record that can be compared, contrasted and coordinated to deduce all manner of private information about individuals. By holding that this kind of surveillance doesn't impair an individual's reasonable expectation of privacy, the panel hands the government the power to track the movements of every one of us, every day of our lives.

The Supreme Court has recognized that advances in "police technology [can] erode the privacy guaranteed by the Fourth Amendment." *Kyllo* v. *United States*, 533 U.S. 27, 34 (2001). To guard against this, courts "must take the long view, from the original meaning of the Fourth Amendment forward." *Id.* at 40. *Kyllo* followed a line of cases going back to *United*

*States* v. *Karo*, 468 U.S. 705 (1984), *Katz*, 389 U.S. at 353, and *Silverman* v. *United States*, 365 U.S. 505, 512 (1961), which stemmed the erosion of personal privacy wrought by technological advances.

In *Kyllo*, the Court held that use of a thermal imager to detect the heat emanating from defendant's home was a search for purposes of the Fourth Amendment because the then-new technology enabled police to detect what was going on inside the home—activities the homeowner was entitled to consider private. Any other conclusion, the Court noted, "would leave the homeowner at the mercy of advancing technology—including imaging technology that could discern all human activity in the home." *Kyllo*, 533 U.S. at 35-36 (citing *Karo*, 468 U.S. at 705). "While the technology used in the present case was relatively crude," the Court continued, "the rule we adopt must take account of more sophisticated systems that are already in use or in development." *Id.* at 36. In determining whether the tracking devices used in Pineda-Moreno's case violate the Fourth Amendment's guarantee of personal privacy, we may not shut our eyes to the fact that they are just advance ripples to a tidal wave of technological assaults on our privacy.

If you have a cell phone in your pocket, then the government can watch you. Michael Isikoff, *The Snitch in Your Pocket*, Newsweek, Mar. 1, 2010, *available at* http://www.newsweek.com/id/233916. At the government's request, the phone company will send out a signal to any cell phone connected to its network, and give the police its location. Last year, law enforcement agents pinged users of just one service provider—Sprint—over eight million times. *See* Christopher Soghoian, *8 Million Reasons for Real Surveillance Oversight*, Slight Paranoia (Dec. 1, 2009) http://paranoia/dubfire. net/2009/12/8-million-reasons-for-real-surveillance.html. The volume of requests grew so large that the 110-member electronic surveillance team couldn't keep up, so Sprint automated the process by developing a web interface that gives

agents direct access to users' location data. *Id.* Other cell phone service providers are not as forthcoming about this practice, so we can only guess how many millions of *their* customers get pinged by the police every year. *See* Justin Scheck, *Stalkers Exploit Cellphone GPS*, Wall St. J., Aug. 5, 2010, at A1, A14 (identifying AT&T and Verizon as providing "law-enforcement[ ] easy access to such data").

Use LoJack or OnStar? Someone's watching you too. *E.g.*, OnStar Stolen Vehicle Assistance, http://www.onstar.com/us_english/jsp/plans/sva.jsp (last visited July 17, 2010). And it's not just live tracking anymore. Private companies are starting to save location information to build databases that allow for hyper-targeted advertising. *E.g.*, Andrew Heining, *What's So Bad About the Google Street View Data Flap?*, Christian Sci. Monitor, May 15, 2010, *available at* http://www.csmonitor.com/USA/2010/0515/What-s-so-bad-about-the-Google-Street-View-data-flap. Companies are amassing huge, ready-made databases of where we've all been. If, as the panel holds, we have no privacy interest in where we go, then the government can mine these databases without a warrant, indeed without any suspicion whatsoever.

By tracking and recording the movements of millions of individuals the government can use computers to detect patterns and develop suspicions. It can also learn a great deal about us because where we go says much about who we are. Are Winston and Julia's cell phones together near a hotel a bit too often? Was Syme's OnStar near an STD clinic? Were Jones, Aaronson and Rutherford at that protest outside the White House? The FBI need no longer deploy agents to infiltrate groups it considers subversive; it can figure out where the groups hold meetings and ask the phone company for a list of cell phones near those locations.

The panel holds that the government can obtain this information without implicating the Fourth Amendment because an individual has no reasonable expectation of privacy in his

movements through public spaces where he might be observed by an actual or hypothetical observer. But that's quite a leap from what the Supreme Court actually held in *Knotts*, which is that you have no expectation of privacy as against police who are conducting visual surveillance, albeit "augmenting the sensory faculties bestowed upon them at birth with such enhancements as science and technology afford[s] them." 460 U.S. at 282.

You can preserve your anonymity from prying eyes, even in public, by traveling at night, through heavy traffic, in crowds, by using a circuitous route, disguising your appearance, passing in and out of buildings and being careful not to be followed. But there's no hiding from the all-seeing network of GPS satellites that hover overhead, which never sleep, never blink, never get confused and never lose attention. Nor is there respite from the dense network of cell towers that honeycomb the inhabited United States. Acting together these two technologies alone can provide law enforcement with a swift, efficient, silent, invisible and *cheap* way of tracking the movements of virtually anyone and everyone they choose. *See, e.g.*, GPS Mini Tracker with Cell Phone Assist Tracker, http://www.spyville.com/passive-gps.html (last visited July 17, 2010). Most targets won't know they need to disguise their movements or turn off their cell phones because they'll have no reason to suspect that Big Brother is watching them.

The Supreme Court in *Knotts* expressly left open whether "twenty-four hour surveillance of any citizen of this country" by means of "dragnet-type law enforcement practices" violates the Fourth Amendment's guarantee of personal privacy. 460 U.S. at 283-84. When requests for cell phone location information have become so numerous that the telephone company must develop a self-service website so that law enforcement agents can retrieve user data from the comfort of their desks, we can safely say that "such dragnet-type law enforcement practices" are already in use. This is precisely

the wrong time for a court covering one-fifth of the country's population to say that the Fourth Amendment has no role to play in mediating the voracious appetites of law enforcement. *But see Maynard*, slip op. at 19.

\* \* \*

I don't think that most people in the United States would agree with the panel that someone who leaves his car parked in his driveway outside the door of his home invites people to crawl under it and attach a device that will track the vehicle's every movement and transmit that information to total strangers. There is something creepy and un-American about such clandestine and underhanded behavior. To those of us who have lived under a totalitarian regime, there is an eerie feeling of déjà vu. This case, if any, deserves the comprehensive, mature and diverse consideration that an en banc panel can provide. We are taking a giant leap into the unknown, and the consequences for ourselves and our children may be dire and irreversible. Some day, soon, we may wake up and find we're living in Oceania.

---

REINHARDT, Circuit Judge, dissenting from the denial of rehearing en banc:

I concur in Chief Judge Kozinski's dissent.

I have served on this court for nearly three decades. I regret that over that time the courts have gradually but deliberately reduced the protections of the Fourth Amendment to the point at which it scarcely resembles the robust guarantor of our constitutional rights we knew when I joined the bench. *See Fisher v. City of San Jose*, 558 F.3d 1069, 1089 (9th Cir. 2009) (en banc) (Reinhardt, J., dissenting); *United States v. Ankeny*, 502 F.3d 829, 841 (9th Cir. 2007) (Reinhardt, J., dissenting); *United States v. Crapser*, 472 F.3d 1141, 1149 (9th Cir. 2007)

(Reinhardt, J., dissenting); *United States v. Gourde*, 440 F.3d 1065, 1074 (9th Cir. 2006) (en banc) (Reinhardt, J., dissenting); *United States v. Kincade*, 379 F.3d 813, 842 (9th Cir. 2004) (en banc) (Reinhardt, J., dissenting); *United States v. Hudson*, 100 F.3d 1409, 1421 (9th Cir. 1996) (Reinhardt, J., dissenting); *Acton v. Vernonia Sch. Dist. 47J*, 66 F.3d 217, 218 (9th Cir. 1995) (Reinhardt, J., dissenting); *United States v. Barona*, 56 F.3d 1087, 1098 (9th Cir. 1995) (Reinhardt, J., dissenting); *United States v. Kelley*, 953 F.2d 562, 566 (9th Cir. 1992) (Reinhardt, J., dissenting); *United States v. Alvarez*, 899 F.2d 833, 840 (9th Cir. 1990) (Reinhardt, J., dissenting); *United States v. Flores*, 679 F.2d 173, 178 (9th Cir. 1982) (Reinhardt, J., dissenting).

These decisions have curtailed the "right of the people to be secure . . . against unreasonable searches and seizures" not only in our homes and surrounding curtilage, but also in our vehicles, computers, telephones, and bodies — all the way down to our bodily fluids and DNA.

Today's decision is but one more step down the gloomy path the current Judiciary has chosen to follow with regard to the liberties protected by the Fourth Amendment. Sadly, I predict that there will be many more such decisions to come.

I dissent.