
DA 11-0342

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 22

MONTANA STATE FUND,

       Petitioner and Appellee,

  v.

RANDALL SIMMS,

       Respondent and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDV-2011-295
Honorable James P. Reynolds, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Gene R. Jarussi, Jarussi & Bishop, Billings, Montana

          Michael G. Eiselein, Eiselein & Grubbs, Billings, Montana

      For Appellee:

          Bradley J. Luck, Elena J. Zlatnik, Garlington, Lohn & Robinson, PLLP, Missoula, Montana

          Thomas Martello, Special Assistant Attorney General, Montana State Fund, Helena, Montana

Submitted on Briefs:  December 7, 2011

Decided:  February 1, 2012

Filed:

_____
               Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Randall Simms appeals from the Memorandum and Order (Order) of the First Judicial District Court of Lewis and Clark County, Montana, granting the Montana State Fund's (MSF) petition to disseminate video footage taken of him in public places. The videos were deemed confidential criminal justice information (CCJI) by the District Court and the Order allowed them to be used in relation to Simms' workers' compensation (WC) claim in any manner consistent with the Montana Rules of Civil Procedure and Workers' Compensation Court (WCC) procedures. Simms appeals. He argues that MSF did not have standing to file an action for dissemination under the Montana Criminal Justice Information Act of 1979 (Act), and that the District Court inadequately balanced the demands of individual privacy against the merits of disclosure, did not follow established rules of statutory construction, and improperly identified and weighed the competing interests at issue.

¶2 We affirm.

## ISSUES

¶3 Simms raises four issues on appeal. A restatement of the dispositive issue is:

¶4 Did the District Court err when it authorized MSF to disseminate certain confidential criminal justice information for use in a pending matter?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Simms was injured in the course and scope of his employment on May 3, 1999, while working for Bozeman Glass in Bozeman, Montana. MSF provided WC insurance to Simms' employer at the time of the injury and accepted Simms' claim. Simms'

2

condition deteriorated over time, and he was found to be permanently and totally disabled and unable to return to work. Simms was then diagnosed with Complex Regional Pain Syndrome (CRPS), which restricted his ability to move around and use his extremities, confined him to a wheelchair, required domiciliary care, and prevented him from driving.

¶6     Due in part to the CRPS diagnosis, Simms and MSF agreed to settle for $610,000 in March 2006. The settlement closed various benefit categories while leaving open certain medical benefits causally related to the injury. Believing Simms' "ongoing disability condition . . . was a continuation of the compensable effects of the industrial injury," MSF continued to pay medical benefits for Simms.

¶7     MSF routinely performs ongoing verifications of disabilities, and decided to do so in Simms' case. As established under § 39-71-211, MCA, and pursuant to Executive Order No. 15-93, MSF has a specific unit—a confidential criminal justice agency—to prevent and detect fraud. The Fraud Unit includes the Special Investigative Unit (SIU) which performs the investigations. MSF utilized the services of the SIU to investigate Simms. In August and September 2002 and September 2006 through May 2007, the SIU took multiple videos of Simms in public settings, looking for evidence of his physical activities and his possible ability to return to work. The twelve DVDs include two videos taken in 2002 and videos taken on more than ten occasions in 2006 and 2007, apparently totaling over two hours of footage.

¶8     In January 2007, MSF's attorney sent a letter, together with copies of the videos, to Simms' attorney for review. The letter noted that "[t]he dramatic change of condition is apparent," and the presumptions used when settling the case "have . . . proven to be

3

erroneous, at a minimum." Later in June 2007, MSF disseminated the videos to Simms' treating physician and asked for his interpretation of the content. The physician sent a letter back to MSF dated June 28, 2007. The physician found the activity on the videos inconsistent with the information provided by Simms, which caused MSF to believe Simms' disability status required re-evaluation and that probable cause existed to conduct further investigation. MSF considered the videos CCJI from that point onward.

¶9 On August 27, 2007, MSF moved the District Court for an order authorizing it to receive CCJI pertaining to Simms from the SIU. According to MSF, the videos showed that Simms "may have exaggerated the extent of his physical handicaps and/or faked or feigned his disability," potentially committing fraud. The court ordered the SIU to release the investigative file concerning Simms' WC claim, which meant disseminating the CCJI to MSF, including the videos. MSF then initiated a civil proceeding against Simms in WCC on September 20, 2007, titled *Mont. State Fund v. Randall Simms*, No. 2007-1955. This proceeding remains pending.

¶10 In a separate WCC proceeding, No. 2009-2242, MSF sought an Independent Medical Examination of Simms in December 2010. The WCC found MSF had improperly released the videos to the treating physician during that proceeding and barred it from using the videos and the physician's letter in the proceedings, though the court declined Simms' request to prevent the use of the videos in all further related proceedings.

¶11 In response to the foregoing WCC ruling, MSF formally petitioned the District Court on March 18, 2011, for the release of certain CCJI, as allowed under § 44-5-303,

4

MCA. MSF had previously submitted several videos to the court under seal for in camera review, and MSF sought permission from the District Court to use and disseminate them. Simms objected to MSF's petition, and the court ordered that the videos remain under seal pending the court's decision on the petition.

¶12 Simms moved to dismiss MSF's petition on March 31, 2011, arguing that MSF lacked standing to bring the petition and therefore there was an absence of a case or controversy for determination. Both parties briefed the issues. On June 13, 2011, the District Court granted MSF's petition, releasing the videos to MSF and authorizing MSF to use the video footage in the ongoing WCC proceeding No. 2007-1955 for any purpose authorized under the Montana Rules of Civil Procedure and the WCC procedure. The District Court specifically noted it made no ruling on whether the videos *should* be admitted in the WCC proceedings, which it noted was a decision for the WCC judge to make. Although it did not specifically rule on Simms' motion to dismiss the MSF petition, it is implicit from the court's Order that the motion to dismiss was denied.

¶13 Simms appeals.

## STANDARD OF REVIEW

¶14 We review de novo a district court's ruling on a motion to dismiss. *Grizzly Sec. Armored Express, Inc. v. Armored Group, LLC*, 2011 MT 128, ¶ 12, 360 Mont. 517, 255 P.3d 143. A district court's determination regarding standing presents a question of law which we review de novo for correctness. *Aspen Trails Ranch, LLC v. Simmons*, 2010 MT 79, ¶ 30, 356 Mont. 41, 230 P.3d 808 (citing *In re Charles M. Bair Family Trust*,

5

2008 MT 144, ¶ 86, 343 Mont. 138, 183 P.3d 61); *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 28, 360 Mont. 207, 255 P.3d 80.

¶15 A district court's interpretation and application of a statute is a conclusion of law which we review for correctness. *In re Adoption of S.R.T.*, 2011 MT 219, ¶ 11, 362 Mont. 39, 260 P.3d 177.

## DISCUSSION

¶16 *Did the District Court err when it authorized MSF to disseminate certain confidential criminal justice information for use in a pending matter?*

¶17 Simms argues on appeal that the petition to disseminate the videos should have been dismissed. He alleges that MSF did not have standing to bring the petition under § 44-5-303, MCA, and therefore the District Court did not have jurisdiction over the matter. Conversely, MSF argues that it had standing and was allowed to file an action for the dissemination of information it considered appropriate and permissible under § 44-5-303(6), MCA. MSF also asserts that the District Court properly performed the requisite balancing test before concluding that MSF was allowed to use the videos.

¶18 Both the WCC and the District Court concluded that the videos were CCJI during this stage of the proceedings, and this ruling has not been appealed. The Act describes the procedure for the dissemination of CCJI, and provides in pertinent part:

(1) Except as provided in subsections (2) through (4), *dissemination of confidential criminal justice information is restricted to criminal justice agencies, to those authorized by law to receive it, and to those authorized to receive it by a district court upon a written finding that the demands of individual privacy do not clearly exceed the merits of public disclosure.* Permissible dissemination of confidential criminal justice information under this subsection includes receiving investigative information from and sharing investigative information with a chief of a governmental fire

6

agency organized under Title 7, chapter 33, or fire marshal concerning the criminal investigation of a fire.

.   .   .

(6) The procedures set forth in subsection (5) are not an exclusive remedy. *A person or organization may file any action for dissemination of information that the person or organization considers appropriate and permissible.*

Section 44-5-303(1), (6), MCA (emphasis added).  Under § 44-5-303(6), MCA, MSF as an organization is allowed to file an action for the dissemination of information MSF believes to be "appropriate and permissible."  The District Court therefore did not err in implicitly denying Simms' motion to dismiss for lack of standing.

¶19    As defined by the Act, CCJI includes "criminal investigative information," "criminal justice information or records made confidential by law," and "any other criminal justice information not clearly defined as public criminal justice information." Section 44-5-103(3)(a), (d), (e), MCA.  "Criminal investigative information" is defined as:

> information associated with an individual, group, organization, or event compiled by a criminal justice agency in the course of conducting an investigation of a crime or crimes.  It includes information about a crime or crimes derived from reports of informants or investigators or from any type of surveillance.

Section 44-5-103(6)(a), MCA.  " 'Criminal justice information' means information relating to criminal justice collected, processed, or preserved by a criminal justice agency." Section 44-5-103(8)(a), MCA.  " 'Dissemination' means the communication or transfer of criminal justice information to individuals or agencies other than the criminal

7

justice agency that maintains the information. It includes confirmation of the existence or nonexistence of criminal justice information." Section 44-5-103(11), MCA.

¶20 The Act defines a "criminal justice agency" as "any federal, state, or local government agency designated by statute or by a governor's executive order to perform as its principal function the administration of criminal justice." Section 44-5-103(7)(b), MCA. In its December 2010 order, the WCC determined that MSF in its entirety is not a criminal justice agency; however, the Fraud Unit of MSF, including the SIU, is a criminal justice agency. Dissemination of CCJI is allowed to those other than criminal justice agencies when authorized by a district court to receive it, once the district court produces written findings that the "demands of individual privacy do not clearly exceed the merits of public disclosure." Section 44-5-303(1), MCA; *see* Mont. Const. art. II, § 9.

¶21 The District Court conducted the balancing test called for in the statute, addressing the inevitable conflict between the "right to know" and the "right to privacy" to determine if MSF should be authorized to disseminate the CCJI in question. Section 44-5-303(1), MCA; *Jefferson Co. v. Mont. Std.*, 2003 MT 304, ¶ 14, 318 Mont. 173, 79 P.3d 805; Mont. Const. art. II, §§ 9, 10. MSF was required to demonstrate that it was entitled to receive the requested information. *Jefferson Co.*, ¶ 14. It did so by setting forth the reasons for its request and satisfying the requisites of § 44-5-303(1) and (6), MCA. At that point the burden shifted to Simms to show why the videos should not be released. *Bozeman Daily Chronicle v. City of Bozeman Police Dept.*, 260 Mont. 218, 227, 859 P.2d 435, 441 (1993). The court considered the arguments of the parties and then applied the two-part test to determine: 1) whether Simms had a "subjective or actual

expectation of privacy," which is a question of fact; and 2) whether society is willing to recognize that expectation as reasonable. *Yellowstone Co. v. Billings Gazette*, 2006 MT 218, ¶ 20, 333 Mont. 390, 143 P.3d 135; *Jefferson Co.*, ¶ 15; *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 23, 333 Mont. 331, 142 P.3d 864.

¶22 The District Court determined that Simms' actions documented in the videos took place in public locations, and that Simms did not in any way attempt to conceal his identity or act so as to assert a privacy interest in his actions. The court further found that society would not view as reasonable an assertion of privacy in certain activities performed on public roads and sidewalks. Consequently, the court found that Simms did not have a subjective or actual expectation of privacy, nor did society view his expectation of privacy as reasonable.

¶23 The District Court also found the merits of disclosure to be substantial. The court specified that "[t]he proper operation of the workers compensation system is a substantial societal interest," and "[t]he videos may bear on a determination of whether Simms engaged in misbehavior concerning his industrial accident." The District Court therefore concluded that the demands of Simms' individual privacy did not clearly exceed the merits of public disclosure. *See Jefferson Co.*, ¶ 18.

¶24 We conclude that the District Court did not err when it authorized MSF to disseminate certain CCJI under § 44-5-303, MCA. The District Court correctly interpreted the statute and adequately engaged in the statutorily mandated balancing of competing concerns. We therefore will not disturb its decision.

¶25 Finally, we decline to address *when* the videos became CCJI. As indicated, both the WCC and the District Court concluded the videos are presently CCJI. Whether they were CCJI when the District Court released them in 2007 is not an issue before us in this case. We do emphasize that in future district court or WCC cases involving the potential release of information that could possibly be considered CCJI, the courts must fully comply with the statutory requirements of the Act before authorizing the release of the information.

**CONCLUSION**

¶26 For the foregoing reasons, we affirm the Order of the District Court.

/S/ PATRICIA COTTER

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice James C. Nelson, specially concurring.

¶27 Based on the procedural posture of this case and the specific issues raised by Simms on appeal, I join the Court's decision, with the following caveat.

10

¶28 I continue to believe that the ongoing and admitted practices of Montana State Fund (MSF) and its Special Investigation Unit (SIU) with respect to the acquisition and dissemination of confidential criminal justice information are patently illegal. My rationales for reaching this conclusion are set forth, in substantial detail, in my dissenting opinion to this Court's order in *In re Rules of Prof. Conduct*, No. OP 11-0439 (Nov. 1, 2011). I believe MSF's and SIU's practices unlawfully intrude upon the doctor-patient relationship, are contrary to the Montana Criminal Justice Information Act, and violate the constitutional rights of workers' compensation claimants under Article II, Sections 10 and 11 of the Montana Constitution. *Rules of Prof. Conduct* at 8-32 (Nelson & Wheat, JJ., concurring in part and dissenting in part).

¶29 Notably, the absurdity of MSF's procedures is on full display in this case. Only *after* MSF had already sent videotape footage (obtained by SIU investigators) to Simms' attorney and to Simms' treating physician did it then occur to MSF that maybe it ought to get a court order authorizing it, in the first instance, to "receive" this confidential criminal justice information from SIU. Opinion, ¶¶ 8-9. MSF and SIU believe that so long as SIU has not yet deemed investigative information in its possession to be "confidential criminal justice information," SIU may share that information with MSF and MSF, in turn, may disseminate the information to whomever it wishes. This belief is flat wrong. *Rules of Prof. Conduct* at 14-18 (Nelson & Wheat, JJ., concurring in part and dissenting in part).

¶30 In this regard, Workers' Compensation Court Judge Shea got it right when he concluded:

State Fund's contentions blur the distinction between State Fund as a whole and the State Fund Fraud Group, the only part of State Fund which was designated as a criminal justice agency by Executive Order. State Fund argues, for example: "The State Fund's SIU serves as an investigative tool both in the State Fund's role as a criminal justice agency as well as its primary role as an insurer." Again, State Fund as a whole was *not* designated as a criminal justice agency; only that portion of State Fund which comprises the State Fund Fraud Group constitutes a criminal justice agency under § 44-5-103(7), MCA.

The core of State Fund's argument is that the SIU wears two hats: it sometimes functions just as any other investigator would for any other insurance company, and it sometimes functions as a criminal justice agency. The difficulty in State Fund's position is that the Executive Order and the applicable statutes do not provide for this distinction. The SIU cannot conduct an investigation and then decide whether or not it did so wearing its criminal justice agency hat or its insurance investigator hat. That determination is made by statute [in particular, § 44-5-103, MCA].

*Mont. State Fund v. Simms*, 2010 MTWCC 41, ¶¶ 12-13, 2010 MT Wrk. Comp. LEXIS 44 (Dec. 29, 2010) (emphasis in original, footnote omitted).

¶31   MSF took the position that the ten segments of surveillance video at issue did not *become* confidential criminal justice information until *after* it was reviewed by Simms' physician, *after* Simms' physician reported back to MSF that Simms' activities depicted in the video were inconsistent with his reported limitations, and *after* SIU made its determination that "probable cause" existed that a crime had been committed. Judge Shea properly rejected this approach:

State Fund's use of the "probable cause" standard for determining when an SIU investigation becomes confidential criminal justice information is incorrect. In the criminal code, probable cause is the standard for issuance of a search warrant, arrest of a criminal suspect, and filing criminal charges. In virtually all of those circumstances, some degree of criminal investigation *precedes* a probable cause determination. State Fund's argument that it is only *after* a probable cause determination is made that the preceding investigation becomes criminal in nature, puts the proverbial cart before the horse. Following State Fund's reasoning, a

12

criminal justice agency could take surveillance video of a suspected drug dealer selling small baggies of white powder, yet the surveillance would not constitute a criminal investigation—and the surveillance thereby become confidential criminal justice information—until the criminal justice agency confirmed that the white powder was cocaine. Moreover, since the criminal justice agency itself makes the initial probable cause determination, State Fund's argument would allow a criminal justice agency to unilaterally determine when, if ever, investigatory materials "become" confidential criminal justice information. This would eviscerate the privacy protections afforded by the Criminal Justice Information Act.

*Simms*, 2010 MTWCC 41, ¶ 16 (emphases in original, footnotes omitted).

¶32 One other facet of this case deserves mention. As I discussed in *Rules of Prof. Conduct* at 10, 24-29, SIU investigators conduct surreptitious videotaped surveillance of State Fund claimants without a warrant—such as occurred to Simms. This sometimes includes following a claimant around town, secretly videotaping his activities. State Fund argued that such surveillance is legal because "a person has no privacy expectation for what he or she does in plain view in public." I disagreed with this proposition, noting that while a person cannot expect to preserve the same degree of privacy for himself or his affairs in public as he could expect at home, Montanans are not prepared to accept as reasonable State Fund's proposition that the government can track and record our every move throughout the day. *Rules of Prof. Conduct* at 25 (Nelson & Wheat, JJ., concurring in part and dissenting in part). To the contrary,

Montanans expect that they have a right of privacy in their affairs, even when they leave their homes—albeit, not to the same degree as they expect within their homes. We accept fixed cameras in various locations, like banks, parking garages, and businesses. We are willing to give up some privacy for the sake of the security that these devices provide. But we do not accept cameras that follow us all around town, monitoring and recording our every move for no purpose other than to detect and document evidence of unlawful activity.

13

*Rules of Prof. Conduct* at 29 (Nelson & Wheat, JJ., concurring in part and dissenting in part).

¶33 Notably, the Supreme Court last week issued a decision in which this exact issue was discussed. *United States v. Jones*, No. 10-1259 (U.S. Jan. 23, 2012). There, the police, acting without a valid search warrant, attached a Global Positioning System (GPS) tracking device to Jones's vehicle and then used that device to monitor the vehicle's movements on public streets over a four-week period. The Supreme Court unanimously concluded that this was a search. The five-Justice majority reached this conclusion under a trespass rationale—i.e., that by attaching an information-gathering device to an "effect" (Jones's vehicle), the government "physically occupied private property for the purpose of obtaining information," which constitutes a search. *Jones*, slip op. at 4, 9-10. The four Justices concurring in the judgment reached this conclusion based on *Katz*'s "reasonable expectation of privacy" test. *See Jones*, slip op. at 13-14 (Alito, Ginsburg, Breyer, & Kagan, JJ., concurring in the judgment); *see also Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 516 (1967) (Harlan, J., concurring); *State v. Allen*, 2010 MT 214, ¶ 75, 357 Mont. 495, 241 P.3d 1045 (Nelson, J., specially concurring).

¶34 What are particularly noteworthy in the present context are the remarks of the concurring opinions in *Jones*. Justice Alito opined that relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. He concluded, however, that the use of longer term

14

GPS monitoring in investigations of most offenses impinges on expectations of privacy.

*Jones*, slip op. at 13 (Alito, Ginsburg, Breyer, & Kagan, JJ., concurring in the judgment).

> For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period. In this case, for four weeks, law enforcement agents tracked every movement that respondent made in the vehicle he was driving. We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4-week mark. Other cases may present more difficult questions. But where uncertainty exists with respect to whether a certain period of GPS surveillance is long enough to constitute a Fourth Amendment search, the police may always seek a warrant.

*Jones*, slip op. at 13-14 (Alito, Ginsburg, Breyer, & Kagan, JJ., concurring in the judgment).

¶35    Justice Sotomayor, who joined the majority opinion, felt that the government's physical invasion of personal property (Jones's vehicle) to gather information was a search under the Fourth Amendment's longstanding trespassory test, which *Katz*'s reasonable-expectation-of-privacy test augmented but did not displace. *Jones*, slip op. at 1-2 (Sotomayor, J., concurring). Nevertheless, she noted her agreement with Justice Alito that, at the very least, longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy under the *Katz* test as well. *Jones*, slip op. at 3 (Sotomayor, J., concurring). Justice Sotomayor then added:

> In cases involving even short-term monitoring, some unique attributes of GPS surveillance relevant to the *Katz* analysis will require particular attention. GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations. See, *e.g.*, *People v. Weaver*, 12 N.Y.3d 433, 441-442, 909 N.E.2d 1195, 1199 (2009) ("Disclosed in [GPS] data . . . will be trips the indisputably private

nature of which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on"). The Government can store such records and efficiently mine them for information years into the future. [*United States v. Pineda-Moreno*, 617 F.3d 1120, 1124 (CA9 2010) (Kozinski, C.J., dissenting from denial of rehearing en banc).] And because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: "limited police resources and community hostility." *Illinois v. Lidster*, 540 U.S. 419, 426 (2004).

Awareness that the Government may be watching chills associational and expressive freedoms. And the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse. The net result is that GPS monitoring—by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the Government, in its unfettered discretion, chooses to track—may "alter the relationship between citizen and government in a way that is inimical to democratic society." *United States v. Cuevas-Perez*, 640 F.3d 272, 285 (CA7 2011) (Flaum, J., concurring).

I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one's public movements. I would ask whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on.

*Jones*, slip op. at 3-4 (Sotomayor, J., concurring).

¶36 These observations resonate with respect to SIU's admitted practice of tracking, monitoring, and videotaping workers' compensation claimants as they go about their daily lives. MSF and SIU are flat wrong in their belief that this sort of surveillance and information gathering does not implicate constitutional rights because "a person has no privacy expectation for what he or she does in plain view in public." Montanans do retain expectations of privacy while in public. And Montanans do not reasonably expect that state government, in its unfettered discretion and without a warrant, is recording and

16

aggregating their everyday activities and public movements in a manner which enables the State to ascertain and catalog their political and religious beliefs, their sexual habits, and other private aspects of identity.[1]

¶37 In its order in *Rules of Prof. Conduct*, this Court acknowledged "the troubling nature of some of the practices at issue," but decided that "[t]he propriety of these practices should be addressed with the benefit of a fully developed record from a district court." *Rules of Prof. Conduct* at 6. The Court likewise declines to delve into these matters in the present case, given the particular issues raised by Simms on appeal. In light of the Court's narrow holdings herein, further discussion of MSF's practices (beyond what I have already discussed above) is unnecessary. I appreciate, however, the Court's cautioning statement that "the courts must fully comply with the statutory requirements of the Act before authorizing the release of the [confidential criminal justice] information." Opinion, ¶ 25.

¶38 With these observations, I specially concur.

---

[1] Notably, Justice Sotomayor also suggested—and I agree—that "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties." *Jones*, slip op. at 5 (Sotomayor, J., concurring). She pointed out that this approach is ill-suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. For example, people disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the email addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. Yet, it is doubtful "that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. . . . I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection." *Jones*, slip op. at 5-6 (Sotomayor, J., concurring).

/S/ JAMES C. NELSON

Justice Michael E Wheat joins in the Special Concurrence of Justice James C. Nelson.


/S/ MICHAEL E WHEAT