ECKERSTROM, Presiding Judge,
dissenting.
¶ 19 I fully agree with my colleagues’ conclusion that Estrella has forfeited his argument that the placement of a GPS tracking device on the vehicle he drove from Sierra Vista to Tucson constituted a trespass and therefore a search under the analysis the United States Supreme Court adopted in Jones. And, because Estrella made no such argument to the trial court, he presented no evidence that he had any interest in the vehicle that would have provided him standing to complain about a trespass upon it.
¶ 20 I write separately, however, because I would conclude that the remote, electronic, non-consensual tracking of a person’s movements with a GPS monitor intrudes upon a person’s reasonable expectation of privacy. For this reason, the state’s electronic tracking of Estrella must be characterized as a search, triggering the traditional protections of the Fourth Amendment.
¶ 21 Neither the United States Supreme Coui’t nor any Atizona appellate court has squarely addressed whether the state’s use of a GPS monitor to remotely track a person constitutes a search in the absence of a trespass. See Jones, — U.S. at —, 132 S.Ct. at 953-54 (majority declining to address whether electronic tracking without accompanying trespass would constitute search); Knotts, 460 U.S. at 285, 103 S.Ct. 1081 (concluding that use of radio beeper, not itself capable of remote tracking but attached to assist visual tracking, not search). However, as my colleagues correctly acknowledge, the Court has adopted, and repeatedly applied, an analytical framework for determining *407 whether a particular investigative act constitutes a search cognizable under Fourth Amendment standards. Such a search occurs “when the government violates a subjective expectation of privacy that society recognizes as reasonable.” Kyllo, 533 U.S. at 33, 121 S.Ct. 2038; see also Katz, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring).
¶ 22 Citing Knotts, the majority ultimately concludes that Estrella had no reasonable expectation of privacy in his movements on Arizona’s roads and highways because those movements occurred in public view. See Knotts, 460 U.S. at 285, 103 S.Ct. 1081 (reasoning that use of beeper to assist visual surveillance not search because no information revealed that was not visible to naked eye). Indeed, as the Supreme Court has made clear in Katz, whether an expectation of privacy is reasonable turns in part upon “whether that expectation relates to information that has been ‘expose[d] to the public.’ ” United States v. Maynard, 615 F.3d 544, 558 (D.C.Cir.2010), quoting Katz, 389 U.S. at 351, 88 S.Ct. 507 (alteration in Maynard).
¶ 23 However, that some of our actions may occur in hypothetical public view does not always resolve the question of whether those actions are “exposed to the public” as that phrase has been understood in our jurisprudence. Societal notions of privacy are complex and vary according to context. See O’Connor v. Ortega, 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion) (“We have no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable.”). As one federal circuit has correctly observed, we anchor our expectations of privacy not in what other people could lawfully perceive but rather in what we reasonably expect another person, following conventional social norms, to perceive. See Maynard, 615 F.3d at 559 (citing string of United States Supreme Court cases to support proposition that, in evaluating privacy expectations, “we ask not what another person can physically and may lawfully do but rather what a reasonable person expects another might actually do”). Justice O’Connor underscored this very feature of privacy when she joined the plurality in rejecting a marijuana grower’s claim to privacy from airborne observation and stated:
Ciraolo’s expectation of privacy was unreasonable not because the airplane was operating where it had a “right to be,” but because public air travel at 1,000 feet is a sufficiently routine part of modern life that it is unreasonable for persons on the ground to expect that their curtilage will not be observed from the air at that altitude.
Florida v. Riley, 488 U.S. 445, 453-55, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (O’Connor, J., concurring) (discussing Court’s prior reasoning in California v. Ciraolo, 476 U.S. 207, 212, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); see also Bond v. United States, 529 U.S. 334, 338-39, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000)) (passenger expects baggage will be handled but does not expect others will “feel the bag in an exploratory manner”).
¶ 24 For example, we expose traditionally private parts of ourselves to public view when changing or showering in the locker room at the local fitness center. But well-understood conventions of social behavior assure that we do not focus on each other as we do so. We thus retain some expectation of privacy that society accepts as reasonable as to private moments even in a public setting. Indeed, we would consider it a marked breach of our privacy were any stranger to stare at us as we changed or showered — and we would consider it a greater breach yet if someone were to electronically document that process.
¶ 25 Applying that principle here, Estrella might reasonably expect to episodically and fleetingly encounter many fellow travelers on his journey between his employer’s parking lot in Sierra Vista and the location of his arrest in Tucson. However, he would not reasonably expect any of those persons to follow him the entirety of the trip or exhibit any focus on his path or destination. Thus, although Estrella may not claim any privacy interest at any specific moment in his journey, he retains a reasonable expectation that the sum total of his journey would remain private from comprehensive tracking. See Maynard, 615 F.3d at 563 (making similar *408 observation about more prolonged tracking of a vehicle).[5]
¶ 26 This aspect of privacy we have traditionally enjoyed in our movements, whether by vehicle or foot, is not trivial. “[Even short-term] GPS monitoring generates a precise, comprehensive record of a person’s public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.” Jones, — U.S. at —, 132 S.Ct. at 955 (Sotomayor, J., concurring). As Judge Kozinski of the Ninth Circuit Court of Appeals has pointedly observed:
[W]here we go says much about who we are. Are Winston and Julia’s cell phones together near a hotel a bit too often? Was Syme’s OnStar near an STD clinic? Were Jones, Aaronson and Rutherford at that protest outside the White House? The FBI need no longer deploy agents to infiltrate groups it considers subversive; it can figure out where the groups hold meetings and ask the phone company for a list of cell phones near those locations.
United States v. Pineda-Moreno, 617 F.3d 1120, 1125 (9th Cir.2010) (Kozinski, C.J., dissenting).
¶ 27 I suspect that it is not only Justice Sotomayor and Judge Kozinski who recognize this expectation of privacy. If told that a stranger had been, without our knowledge, electronically tracking our movements, few of us would deny feeling some invasion had occurred. I also suspect that most Americans would consider such non consensual tracking to be an intrusion regardless of whether the tracking had (1) occurred for thirty days or thirty minutes, (2) followed only their movements in hypothetical public view, or (3) coincidentally disclosed any especially private event in their lives.
¶ 28 Indeed, this expectation of privacy has been acknowledged and protected in our laws. Many states, including California, Utah, Minnesota, Pennsylvania, and Florida have enacted statutes imposing civil and criminal penalties for the non-consensual use of electronic tracking devices. See Maynard, 615 F.3d at 564 (listing states and specific statutory provisions). Such statutes demonstrate that society recognizes this expectation of privacy in our movements and the threat of new technology to it. Moreover, those state courts with occasion to squarely address the question have likewise found a reasonable expectation of privacy is invaded by electronic tracking. Id. (summarizing those cases).
¶ 29 My colleagues maintain that our result in this ease is compelled by the Court’s reasoning in Knotts that a person has “no reasonable expectation of privacy in his movements” on public roads. 460 U.S. at 281, 103 S.Ct. 1081. But, in the context we address today — the GPS tracking of a person’s movements on public roads — five justices of the Court have implicitly declined to adopt that part of Knotts’s reasoning. See Jones, — U.S. at —, 132 S.Ct. at 964 (Alito, J., concurring) (in context of long-term GPS tracking, concluding, with three justices joining, that expectation of privacy exists in Jones’s movements although those movements were on public roads); id. at —, 132 S.Ct. at 955 (Sotomayor, J., concurring) (agreeing with Justice Alito’s conclusion and suggesting she would reach same conclusion as to short-term tracking). I, therefore, cannot agree that this aspect of Knotts must control our reasoning in this case.
¶ 30 Nonetheless, the Supreme Court has not retreated from the proposition that law enforcement officers do not engage in a search of constitutional dimension when con *409 ducting visual surveillance of a person’s public movements. See Knotts, 460 U.S. at 281-82, 103 S.Ct. 1081. Why, then, should law enforcement officers be constrained when merely effectuating the same surveillance more efficiently using the convenience of a remote electronic tracking tool?
¶ 31 Five justices of the Supreme Court have suggested that such efficiency and convenience may itself be the relevant constitutional distinction. Justice Alito, joined by three other justices, observed in Jones that “the greatest protections of privacy” have historically been “neither constitutional nor statutory, but practical.” — U.S. at —, 132 S.Ct. at 963 (Alito, J., concurring). “Traditional surveillance for any extended period of time was difficult and costly and therefore rarely undertaken.” Id. In the same case, Justice Sotomayor wrote separately that “because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: ‘limited police resources and community hostility.’” Id. at —, 132 S.Ct. at 956 (Sotomayor, J., concurring), quoting Illinois v. Lidster, 540 U.S. 419, 426, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004).
¶ 32 Placed in practical law enforcement terms, costly investigative techniques like traditional visual surveillance are not likely to be used unless law enforcement officers have good reason to believe the technique will be productive. The cost of such surveillance thereby creates a meaningful natural incentive to deploy the technique only when there is substantial cause — usually probable cause — to do so. See Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (officers have probable cause when “the facts and circumstances within them knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense”). The same incentives do not apply to the comparatively cheap and easily deployed electronic surveillance tools in existence today. See Pineda-Moreno, 617 F.3d at 1125 (Kozinski, C.J., dissenting) (detailing the pervasiveness of electronic tracking devices and ease by which law enforcement may gain access to data generated by those devices). If we decline to characterize the use of such tools to monitor our public movements as a search of constitutional dimension, then, under our laws, governmental officials may track us without cause and at little expense— and do so lawfully. See id. (“If ... we have no privacy interest in where we go, then the government can mine these databases without a warrant, indeed without any suspicion whatsoever.”). I therefore agree with Justice Sotomayor that accepting such an outcome risks altering “‘the relationship between citizen and government in a way that is inimical to democratic society.’ ” Jones, — U.S. at —, 132 S.Ct. at 956 (Sotomayor, J., concurring), quoting United States v. Cuevas-Perez, 640 F.3d 272, 285 (7th Cir.2011) (Flaum, J., concurring).
¶ 33 I cannot agree with Justice Alito’s concurrence in Jones, or the suggestion of my colleagues, that the appropriate application of these principles must turn on the duration or distance of the movements monitored. See — U.S. at —, 132 S.Ct. at 964 (Alito, J., concurring).[6] If we accept the premise that the sum total of a person’s movements on a journey can disclose private features of them lives, then such private features may be discovered in monitoring of comparatively short duration as well as long. A person need not take a long or complex trip to expose “familial, political, professional, religious, and sexual associations” of the variety Justice Sotomayor correctly characterized as private. Id. at —, 132 S.Ct. at 955 (Sotomayor, J., concurring). Nor is it un *410 common for Americans to take a comparatively brief morning or afternoon’s journey, by foot or vehicle, specifically to seek out privacy and solitude that can be elusive at home or work. That illegal searches of longer duration may impose more egregiously on expectations of privacy seems a poor foundation for the argument that shorter-term intrusions constitute no search at all.
¶ 34 Finally, wholly apart from the analytical difficulty in determining the precise duration of tracking that would first trigger constitutional concerns, few officers utilizing electronic tracking tools will be able to accurately predict the length of time such monitoring will be needed to produce evidentiary fruit — or how quickly that monitoring might reveal private features of the target’s life. Yet, under Justice Alito’s dichotomy between prolonged tracking and shorter-term tracking, such predictions will be necessary for officers to determine the need for a warrant, and for magistrates to determine the propriety of issuing them. For those reasons, I do not consider such a distinction practically feasible or analytically sound.
¶ 35 In Justice Alito’s concurring opinion in Jones, a plurality of the Court also posited that advances in technology may necessarily change reasonable expectations of privacy, as methods for readily locating and observing each other become inexpensive and commonplace in contemporary society. See — U.S. at —, 132 S.Ct. at 962-63 (Alito, J., concurring). In that context, Justice Alito suggested that we must ultimately choose between the convenience those technologies provide and our traditional scope of privacy. Id. But our courts have been fully capable of applying and enforcing traditional expectations of privacy in the face of evolving technology. See, e.g., Kyllo, 533 U.S. at 40, 121 S.Ct. 2038 (characterizing use of thermal imaging equipment to detect thermal patterns within home as search requiring warrant); Katz, 389 U.S. at 353, 88 S.Ct. 507 (use of new technology to eavesdrop on public phone booth without physical intrusion constitutes search requiring warrant).
¶ 36 Justice Alito does not explain why our society cannot enjoy the efficiencies provided by evolving technology while maintaining our traditional scope of privacy. In the context presented here, we may continue to reap the benefits of the GPS systems embedded in our cellular telephones and ears without any worry that government may arbitrarily use those systems to track us. To achieve this, our courts need only recognize the privacy interest at stake and properly characterize such tracking as a search. Under our longstanding Fourth Amendment standards, no person could then be lawfully tracked through their cell phones or vehicle navigation systems in the absence of probable cause.
¶ 37 Nor would applying traditional Fourth Amendment constraints on the use of such tools impose any novel hardship on our officers. We have historically depended on the presumptive professionalism and training of our officers in modifying their investigative techniques to conform to the requirements of the Fourth Amendment in a variety of contexts. See, e.g., Arizona v. Gant, 556 U.S. 332, 349, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (acknowledging law enforcement officers trained in Fourth Amendment issues). And, nothing about characterizing remote electronic tracking as a search would prevent officers from using such tools when they can articulate legally sufficient cause for doing so. The traditional exceptions to the warrant requirement would likewise find application here, allowing officers to use electronic tracking technologies upon a showing of probable cause coupled with exigent circumstances, or upon a showing of consent. See State v. Ault, 150 Ariz. 459, 463, 724 P.2d 545, 549 (1986) (exigent circumstances exception to warrant requirement applies in “hot pursuit,” when police respond to emergency, or face probability of destruction of evidence or possibility of violence); State v. Ahumada, 225 Ariz. 544, ¶ 6, 241 P.3d 908, 910 (App.2010) (voluntarily given consent well-established exception to warrant requirement).
¶ 38 For the foregoing reasons, I conclude that the officer’s remote electronic tracking of Estrella was a search that triggered the protection of the Fourth Amendment. I would therefore remand this case to the tidal court for a determination of whether the state can articulate both probable cause to *411 have tracked Estrella and a constitutionally permissible reason for failing to obtain a warrant before doing so.

. The majority analysis suggests that Estrella’s use of his employer’s vehicle might affect whether he possessed a reasonable expectation of privacy in the specific journey here. This is not a trivial point. Just as persons may waive a reasonable expectation of privacy in their homes by taking actions in front of an open window exposed to the public, there are many specific contexts wherein we might forego our usual expectation of privacy in our movements. For example, many jobs require mobile employees to keep their employers advised of their whereabouts at all times. Those employees would have no reasonable expectation of privacy in their movements during work hours. But the facts in the record before us do not provide us with sufficient information to determine the conditions under which Estrella was entitled to use the vehicle here and whether those conditions could be viewed as a waiver of his presumptive expectation of privacy in his movements.

. That formulation has not been adopted by a majority of the Supreme Court. In fact, Justice Scalia, joined by four justices, specifically chides Justice Alito for the analytical chaos implied by Justice Alito’s approach. See Jones, — U.S. at —, 132 S.Ct. at 953. One of those justices, Justice Sotomayor, as discussed below, expressly questions whether electronic monitoring need be prolonged to constitute a search. See id. at —, 132 S.Ct. at 955 (Sotomayor, J., concurring). Thus, the five justices not joining Justice Alito’s concurrence have at minimum conveyed some skepticism of the logic of drawing constitutional distinctions between electronic tracking of short and long duration.